[No. B175147. Second Dist., Div. Six. Mar. 27, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGER WAYNE JANTZ, Defendant and Appellant.

1284

## COUNSEL

Dan Mrotek, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jaime L. Fuster and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PERREN, J.**—Roger Wayne Jantz was convicted of first degree murder (Pen. Code, §§ 187, 189),[1] stalking (§ 646.9, subd. (a)), and making a criminal threat (§ 422). In a bifurcated sanity trial, the jury found that Jantz was sane when he committed the offenses. He was sentenced to prison for 25 years to life for the murder, plus three years for stalking and one year for personal use of a deadly and dangerous weapon in the murder. (§ 12022, subd. (b)(1).) Jantz claims instructional error. He contends the trial court erred by instructing the jury on murder by lying in wait, failing to give a unanimity instruction for the stalking and criminal threat offenses, and failing to instruct the jury that his statements to experts during the sanity trial could be considered to show the basis for the experts' opinions but not for their truth. We conclude that the trial court erred by failing to give a limiting instruction regarding his statements to the experts, but that the error was not prejudicial. We reject Jantz's other contentions. Accordingly, we affirm.

## FACTS

Appellant Jantz and victim Erika Jantz[2] were married in 1994. In March 2002, Erica told Jantz that she wanted a divorce. Jantz became upset, jealous and depressed. He told his mother and friends that he loved his wife and wanted to make the marriage work. He continued to reside with Erika but was looking for a new place to live.

Erika, an emergency room nurse, told coworkers that Jantz followed her wherever she went and, on April 10, 2002, physically assaulted her by throwing her down on the bed and threatening to rape her if she did not let him have sex with her. On April 11, 2002, Erika told coworker Lisa Hall that Jantz told her "he was going to kill himself and that he was going to take her with him." Erika told other coworkers words to the effect that, if anything happened to her, Jantz did it.

Erika and Jantz's 10- or 11-year-old son T. heard his parents arguing about their divorce on April 12 or April 13. Jantz accused Erika of not trying to make the marriage work, but Erika got Jantz "calmed down pretty good." Jantz told T. that, if his parents divorced, T. would live with his mother and see Jantz on weekends.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] We refer to victim Erika Jantz by her first name to avoid confusion with appellant and not out of disrespect.

On April 13, Jantz visited friends. He seemed upset, depressed and sad because Erika wanted a divorce. He said he wished the situation could be better and was hopeful things would work out and the marriage could be saved. He said he had broken a window in Erika's car, but had arranged to have it repaired.

On the evening of April 13, Erika went on a date with coworker Richard Dykhouse, and stayed with Dykhouse until the following morning. Jantz made several unanswered calls to Erika's cell phone during the night. At approximately 4:49 a.m. on April 14, Erika telephoned Jantz at their home, and they spoke for between two and three minutes. Shortly after 5:00 a.m., Jantz telephoned his mother. He was crying and told his mother that Erika had slept with another man and wanted to talk when she got home. Jantz told his mother that he was burning Erika's lingerie in the barbeque.

At 6:00 a.m., Jantz told T. that Erika had cheated on him, and that T. should pack his clothes because he was going to his grandmother's house. Approximately 30 minutes later, Jantz's mother arrived to pick up T. Jantz appeared calm, but acted like he had his mind set on something. Later, Jantz telephoned his mother and told her that he was resigned to the end of his marriage. He said he could not go to his mother's house because Erika wanted to talk to him when she got home to make arrangements for the divorce.

Erika left Dykhouse at 9:00 a.m. and drove to her house, approximately 65 miles away. Between 9:00 and 9:30 a.m., she made three cell phone calls to Jantz. The first and second calls lasted 13 and 24 seconds, respectively, and the third call lasted over two and one-half minutes.

Erika's body was discovered on her kitchen floor at 2:30 p.m., April 14, 2002. She had been hit in the head with a frying pan and stabbed in the neck with a knife. Several bloody kitchen knives and the frying pan were found in the house. Knife wounds had severed Erika's jugular vein and carotid artery and penetrated the surface of her cervical vertebra. There were stab wounds to her abdomen, a broken forearm bone, and other injuries, including defensive wounds indicating a struggle had occurred.

Jantz was found unconscious and snoring on the living room floor. He had several self-inflicted wounds to his body.

The police also found rope tied to the bed, and a baseball bat, hammer, and knife near or under the bed. More rope was found in the bedroom and in the living room under the sofa seat cushion. Bloody rope was found in the hallway.

At trial, Jantz pleaded not guilty and not guilty by reason of insanity. The trial was bifurcated with the sanity phase following the verdict in the guilt phase.

In the sanity phase, defense psychiatrist Ronald Shlenski testified that Jantz told him that Jantz remembered hitting Erika with the frying pan, but did not remember using a knife to kill her. Dr. Shlenski testified that, in his opinion, Jantz suffered from schizophrenia and was insane at the time of the killing. Dr. Shlenski testified that Jantz understood right from wrong and the nature and consequences of his acts when he hit Erika with a pan and when he inflicted wounds on himself after the murder, but not during the few minutes when he was stabbing Erika.

Defense expert Dr. Gary Groth-Marnat also diagnosed Jantz with schizophrenia and testified that his ability to act in a knowing way was probably impaired at the time of the murder, and it would have been difficult for Jantz to distinguish right from wrong at that time. Dr. Groth-Marnat testified that some testing indicated that Jantz may have been malingering and attempting to feign mental illness.

Court-appointed forensic psychologist Dean Given testified that Jantz was sane at the time of the murder because he understood the nature of his actions and knew the difference between right and wrong. Dr. Given testified that Jantz told him that he had lost control when he hit Erika with a pan and then stabbed her. Jantz told Dr. Given that he knew right from wrong when he killed Erika and that, when he realized what he had done, he tried to kill himself.

Prosecution expert Dr. James Tahmisian testified that Jantz did not suffer from schizophrenia or any other mental disorder or defect at the time of the murder that would render him unable to understand the nature and quality of his acts, or the difference between right and wrong. Dr. Tahmisian testified that Jantz told him that he understood right from wrong at the time he killed Erika, and that test results indicated that Jantz was malingering during his evaluation.

Prosecution expert Dr. John Rivard testified that Jantz was not psychotic at the time of the murder and knew right from wrong as well as the nature and quality of his acts. Dr. Rivard testified that, when asked whether he believed he could distinguish right from wrong, Jantz said, "I don't know why I did it, I just knew I did it." Rivard testified that Jantz was malingering during his evaluation.

Jail psychiatrist Dr. Howard Babus testified in rebuttal regarding the question of malingering. Dr. Babus testified that he suspected Jantz was malingering, but could not be certain.

## DISCUSSION

### *No Error in Instructing Jury on Murder by Lying in Wait*

The jury was instructed on the elements of first degree murder by premeditation and deliberation, and first degree murder by means of lying in wait. (§ 189.) Jantz contends that the trial court erred by instructing on lying in wait because the evidence negates that theory as a matter of law. He argues that there is no evidence of concealment and surprise. We disagree.

It is error to instruct a jury on a theory of guilt without evidentiary support, but the trial court must instruct the jury on every theory that is supported by substantial evidence. (*People v. Crew* (2003) 31 Cal.4th 822, 835 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].) Substantial evidence is evidence that would allow a reasonable jury to find the existence of the facts underlying the instruction, and to find the defendant guilty beyond a reasonable doubt based on the theory of guilt set forth in the instruction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206 [17 Cal.Rptr.3d 532, 95 P.3d 811]; see also *Crew, supra,* at p. 835.) In making this determination, we view the evidence most favorably to the judgment presuming the existence of every fact that reasonably may be deduced from the record in support of the judgment. There is no instructional error when the record contains substantial evidence in support of a guilty verdict on the basis of the challenged theory. (*Cole, supra,* at p. 1206.)

"Murder perpetrated by lying in wait requires an intentional murder 'committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' " (*People v. Hardy* (1992) 2 Cal.4th 86, 163 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Here, we conclude that there is substantial evidence to support the existence of each of these elements.

There is evidence from which a reasonable jury could conclude that Jantz concealed his purpose to kill his wife. Evidence shows that Erika and Jantz had telephone conversations before 5:00 a.m. on the day of the murder, and later that morning. Common sense permits, or perhaps compels, the inference that the telephone conversations did not alert Erika to Jantz's murderous purpose. Erika would not have walked into her home with the knowledge that she risked being killed. The more reasonable inference is that, during these conversations, Jantz indicated to Erika that he would wait for her to return home so that they could discuss their relationship.

The record shows erratic behavior by Jantz. At times, he was threatening and violent and, at times, he seemed willing to accept divorce while retaining hope that his marriage could be saved. Such shifts in mood, however, do not compel the conclusion that Erika must have suspected he was planning to murder her, especially in light of the undisputed fact that Erika continued to live in the same house with Jantz.

In addition, there is substantial evidence of a period of watching and waiting for an opportune time to act. Jantz waited at the house for hours, and appeared to be planning a violent and deadly confrontation. The precise placement of rope, a baseball bat, and other implements in the house supports the inference that Jantz was preparing for the most opportune moment to attack Erika.

The same evidence also supports a finding that Jantz had an undisclosed plan to make a surprise attack upon an unsuspecting victim from a position of advantage. Evidence suggests that, at the same time he was encouraging Erika to come home to talk about their marriage, Jantz was hiding implements of violence.

Jantz argues that the evidence establishes that Erika provoked Jantz as the result of her frustration over his refusal to accept the end of their marriage. She planned to sleep with another man and tell Jantz about her infidelity as proof positive that the marriage was over. Implementation of this plan, Jantz asserts, put Erika on notice that Jantz was a grave danger to her and negated the element of surprise for a murder by means of lying in wait.

Not only is this argument based on the implausible premise that Erika consciously placed her life in mortal danger, it is at most an alternate interpretation of certain evidence. The presence of substantial evidence supporting the lying-in-wait jury instruction is not undermined by the existence of other interpretations of the evidence.

■ Moreover, prior threats to the victim do not necessarily negate the concealment and surprise elements of murder by lying in wait. (*People v. Arellano* (2004) 125 Cal.App.4th 1088, 1094–1095 [23 Cal.Rptr.3d 172].) A victim of threats and domestic violence may be fearful of further violence, but is not charged with notice that he or she might be murdered. (*Ibid.*)

### *Unanimity Instruction Not Required*

Jantz claims there was evidence of two distinct threats that would support convictions for both the stalking and criminal threats offenses, and that the trial court erred by failing to instruct the jury sua sponte that it must

unanimously agree on the act that constituted those offenses. Jantz argues that one threat is reflected in Lisa Hall's testimony that Erika told her Jantz "was going to kill himself and that he was going to take [Erika] with him," and that a second threat is reflected in testimony by two other coworkers that Erika told them Jantz had said that, if he could not have her, nobody else would.

■ Where the jury receives evidence of more than one factual basis for a conviction, the prosecution must select one act to prove the offense, or the court must instruct the jury that it must unanimously agree on one particular act as the offense. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 [108 Cal.Rptr.2d 436, 25 P.3d 641]; see CALJIC No. 17.01.) A unanimity instruction is not required if the evidence shows one criminal act or multiple acts in a continuous course of conduct. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23].)

■ Here, a unanimity instruction was not required for the section 422 criminal threats offense. That offense requires a threat of "death or great bodily injury" with the specific intent that the statement be taken as a threat. (§ 422.) Assuming there were two threats rather than a single threat related by Erika to multiple coworkers, the record shows that the prosecutor clearly informed the jury in opening and closing argument that the People were electing the threat set forth in Hall's testimony as the basis of the criminal threats offense. This election obviated the necessity of a unanimity instruction. (*People v. Russo, supra,* 25 Cal.4th at p. 1132.)

Jantz argues that the election was ineffective because the prosecutor "emphasized" the testimony of all three witnesses and referred to "threats" in the plural during closing argument. The record, however, shows that the prosecutor used the plural and referred to the testimony of all three witnesses in argument concerning the elements of first degree murder, but not in the portion of the argument concerning the criminal threats offense. The record does not support the conclusion that the prosecutor conveyed the impression to the jury that one of two threats could serve as the basis for a conviction.

■ Similarly, a unanimity instruction was not required for the section 646.9 stalking offense. Stalking requires repeated following or harassment of the victim, and a "credible threat" with the intent of placing the victim in fear for his or her safety. (§ 646.9.) The record shows that the prosecution also elected the threat set forth in Hall's testimony as the basis of the stalking offense and references to possible other threats during closing argument did not undermine that election.

■ Moreover, evidence shows that the stalking consisted of one continuous course of conduct and, therefore, constituted a single offense. *(People v. Stankewitz, supra,* 51 Cal.3d at p. 100.) In fact, stalking requires multiple acts and is "self-defined to require a course of conduct." *(People v. Zavala* (2005) 130 Cal.App.4th 758, 769 [30 Cal.Rptr.3d 398].) Here, if there were multiple threats, they were similar and relatively contemporaneous in time, and the parties did not make any significant distinction between them. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1199 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

### Sanity Trial Instructional Error Not Prejudicial

During the sanity trial, prosecution mental health experts testified that Jantz told them he knew the difference between right and wrong at the time of the murder. Relying on *In re Spencer* (1965) 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33] *(Spencer),* Jantz contends the trial court violated his Sixth Amendment right to counsel by failing to instruct the jury that it could consider these statements only to show the basis of the experts' opinions and not for their truth. (CALJIC No. 2.10.)[3] Jantz also argues that the trial court favored the prosecution on this issue by making inconsistent rulings on objections to testimony by prosecution and defense experts. As Jantz asserts, the court ruled that the jury could not consider his statements to a defense expert for their truth, but statements made to a prosecution expert could be considered as admissions and included the standard instruction regarding admissions in its instructions to the jury. (CALJIC No. 2.70.)[4] We conclude that the trial court erred in failing to give the limiting instruction set forth in *Spencer,* but that the error was harmless beyond a reasonable doubt.

Respondent tacitly concedes that the limiting instruction set forth in *Spencer* should have been given, but argues that Jantz waived his claim by failing to request CALJIC No. 2.10. *(People v. Cantrell* (1973) 8 Cal.3d 672, 683 [105 Cal.Rptr. 792, 504 P.2d 1256], disapproved on other grounds by *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84,

---

[3] CALJIC No. 2.10 states: "There has been admitted in evidence the testimony of a medical expert of statements made by the defendant in the course of an examination of the defendant which were made for the purpose of diagnosis. These statements may be considered by you only for the limited purpose of showing the information upon which the medical expert based his opinion. This testimony is not to be considered by you as evidence of the truth of the facts disclosed by defendant's statements."

[4] Jantz does not claim the trial court erred by instructing the jury with CALJIC No. 2.70, nor does he dispute that a defendant's out-of-court statement is admissible as an exception to the hearsay rule when offered against the defendant, but inadmissible when offered for its truth by the defendant. (See Evid. Code, §§ 1200, 1201.)

603 P.2d 1].) We will exercise our discretion to review an "instruction given, refused or modified" without objection in the trial court because "the substantial rights of the defendant were affected thereby." (§ 1259.)

After a plea of not guilty by reason of insanity, a defendant may be examined by court-appointed and prosecution mental health experts to assist the jury in determining the defendant's sanity. (*People v. Williams* (1988) 44 Cal.3d 883, 961 [245 Cal.Rptr. 336, 751 P.2d 395]; see also §§ 1026, 1027.) The experts necessarily inquire into the defendant's conduct at the time of the offense because the defendant's account of his actions and thought processes can be critical to the formation of an expert's opinion. The inquiry, however, may also result in incriminating statements by the defendant that raise concerns about self-incrimination and the right to be represented by counsel.

In *Spencer*, our Supreme Court struck a balance between protecting these constitutional rights and assuring a meaningful evaluation of the defendant's mental condition. (*Spencer, supra,* 63 Cal.2d at p. 411.)[5] *Spencer* concludes that a defendant is not constitutionally entitled to the presence of counsel during a mental examination provided the defendant is represented by counsel at the time he or she submits to the examination, and subject to limitations on testimony by an examining expert. (*Id.,* at p. 412.) "If, after submitting to an examination, a defendant does not specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should not be permitted to testify at the guilt trial. If defendant does specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should be permitted to testify at the guilt trial, but the court should instruct the jurors that the psychiatrist's testimony as to defendant's incriminating statements should not be regarded as proof of the truth of the facts disclosed by such statements and that such evidence may be considered only for the limited purpose of showing the information upon which the psychiatrist based his opinion." (*Ibid.,* fn. omitted.)

Although *Spencer* considered the admission of evidence during the guilt phase of the trial, its rationale dictates that the limiting instruction should be given in the sanity phase as well. As previously stated, respondent does not dispute this conclusion, and expressly acknowledges that "[i]t is well settled

---

[5] *Spencer*'s analysis was directed at preserving the right to counsel, but later cases have applied its reasoning in the context of self-incrimination. (See *People v. Williams* (1988) 197 Cal.App.3d 1320, 1323–1324 [243 Cal.Rptr. 480]; *People v. Arcega* (1982) 32 Cal.3d 504, 521 [186 Cal.Rptr. 94, 651 P.2d 338].)

that an expert's testimony as to a defendant's incriminating statements may not be regarded as proof of the facts described in such statements." (*People v. Williams* (1988) 45 Cal.3d 1268, 1327 [248 Cal.Rptr. 834, 756 P.2d 221].)

█ When a defendant is compelled to submit to a mental health examination to determine competence to stand trial, statements to the expert are inadmissible. (*People v. Arcega, supra,* 32 Cal.3d at p. 522; see also *People v. Weaver* (2001) 26 Cal.4th 876, 960 [111 Cal.Rptr.2d 2, 29 P.3d 103]; §§ 1368, 1369.) A defendant who pleads not guilty by reason of insanity, however, voluntarily places his mental condition in issue, agrees to submit to a prosecution mental examination, and contemplates testimony by prosecution mental health experts to rebut testimony by defense experts. (*People v. Williams, supra,* 44 Cal.3d at pp. 961–962.)

Accordingly, a defendant waives the privilege against self-incrimination and the right to counsel regarding expert testimony in sanity trials *to the extent necessary* to permit useful sanity examinations by defense and prosecution mental health experts. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1190 [9 Cal.Rptr.2d 834, 832 P.2d 146]; see also *Estelle v. Smith* (1981) 451 U.S. 454, 465–466 [68 L.Ed.2d 359, 101 S.Ct. 1866].) But, these constitutional rights are not forfeited in their entirety merely because a plea of insanity is voluntarily entered by the defendant rather than involuntarily compelled by a court order. The guilt and sanity phases are part of a single criminal trial that is compelled by the state, and a sanity trial is similar to a determination of "guilt" because a successful insanity plea relieves the defendant of all criminal responsibility. (*People v. Hernandez* (2000) 22 Cal.4th 512, 520–521 [93 Cal.Rptr.2d 509, 994 P.2d 354]; *People v. Ferris* (2005) 130 Cal.App.4th 773, 777 [30 Cal.Rptr.3d 426].) In addition, *Spencer*'s limiting instruction is rooted in the notion that the prosecution cannot convict *or punish* a defendant based on " '. . . the simple, cruel expedient of forcing it from his own lips.' " (*Estelle, supra,* at p. 462.)

As a practical matter, there is no danger that the instruction will permit a defendant to utilize his right to silence and right to counsel to prevent the prosecution from controverting defense mental health evidence. (See *People v. Williams, supra,* 44 Cal.3d at pp. 961–962.) The instruction does not render statements by a defendant to a mental health expert inadmissible. Moreover, the limiting instruction conforms to the general rule regarding expert testimony. An expert may base his opinion on reliable hearsay, and may disclose such information to explain the reasons for his or her opinion, as long as the information is not considered for its truth. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *People v. Cantrell, supra,* 8 Cal.3d at p. 683.) Ordinarily, the limiting instruction set forth in

*Spencer* is given to prevent any problems with improper jury consideration of hearsay. (*People v. Dennis* (1998) 17 Cal.4th 468, 533–534 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

▮ Although the trial court erred in failing to give the limiting instruction, the error was not prejudicial and does not require reversal of the sanity verdict. We conclude that, beyond a reasonable doubt, the trial court's failure to give the instruction did not contribute to the sanity verdict.[6] (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *Yates v. Evatt* (1991) 500 U.S. 391, 402–403 [114 L.Ed.2d 432, 111 S.Ct. 1884], disapproved on another point in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4 [116 L.Ed.2d 385, 112 S.Ct. 475].)

Two defense experts testified that Jantz was psychotic at the time of the offenses, but there was little or no evidence that he was insane according to the legal standard. The defense experts were compelled to accept the undisputed evidence establishing that Jantz understood and considered his actions leading up to the murder and immediately after the murder. Dr. Shlenski concluded that Jantz was sane before and after the murder but was out of contact with reality during the moments he was committing the offense. Dr. Groth-Marnat concluded that Jantz was psychotic during the killing, but did not testify that he was insane.

More importantly, the error was not in the admission of evidence, but rather in the failure to instruct regarding the manner in which the jury could consider the evidence. The possibility that the jury considered the statements for their truth rather than as an explanation of the experts' opinions is remote. The sanity trial was a battle of experts, and there is nothing in the record to suggest that the jury gave the statements any greater or less weight due to the absence of the limiting instruction, and no basis to conclude that the jurors would have decided differently had they received the limiting instruction.

Our conclusion is strengthened by the fact that the statements were not an admission of an historical fact. Jantz was making an assessment of his own mental state at the time of the offenses and, in so doing, his statements constituted his own combined medical opinion and legal conclusion. Nothing in the record suggests that, based on the instructional error, the jury relied on the truth of Jantz's own assertion that he could distinguish between right and

---

[6] Ordinarily, instructional error is assessed under the *Watson* reasonable probability standard (*People v. Flood* (1998) 18 Cal.4th 470, 490 [76 Cal.Rptr.2d 180, 957 P.2d 869]), but Jantz's claim implicates his constitutional right to counsel.

wrong to reach its conclusion that Jantz was sane at the time of the offense. Stated differently, it is unrealistic to believe that the jury accepted Jantz's own assessment of his sanity over that of the experts.

The judgment is affirmed.

Gilbert, P. J., and Yegan, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 28, 2006, S142995.