Filed 9/16/14  P. v. Salinas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID ALEXANDER SALINAS,<br><br>Defendant and Appellant. | F065345<br><br>(Super. Ct. No. BF136721A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Hayes H. Gable III, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Charity S. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant David Alexander Salinas of inflicting injury on a cohabitant. He challenges the conviction on the grounds the trial court failed sua sponte to instruct the jury with a unanimity instruction. He also contends the trial court erred in imposing a $240 restitution fine. We reject his contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

Salinas and his girlfriend, Natalie G., lived together in a converted garage in the home of Salinas's mother. Early on May 3, 2011, Salinas and Natalie got into an argument over money. Salinas left the house for several hours and then returned home in the afternoon and resumed arguing. After arguing for a while, Salinas again left the home and returned around 7:00 p.m.

This time Salinas was yelling and broke Natalie's cell phone. Salinas's mother, Teresa Ortega, came into the converted garage and told Salinas to "knock it off." Angry, Salinas took his mother's car keys and threw them over the fence. Salinas again left the home. Natalie eventually went to bed and fell asleep.

Around 1:00 a.m., Salinas returned, entered the garage, and yanked the covers off the bed. He ordered Natalie to get up and to take off her clothes. After Natalie complied, Salinas began kicking her and hitting her in the face repeatedly. He first used an open handed slap to the face and then followed that with punches using a closed fist.

Salinas pushed Natalie into the backyard and shoved her into the shallow end of a swimming pool located at the residence. Salinas ordered her to get out of the pool. He then pushed her back into the garage where he continued to beat her. Eventually, Salinas told Natalie to wipe the blood off her face and to go to sleep.

Natalie did not call the police that night because she thought Salinas would prevent her from leaving the garage to make a phone call.

The next morning, Natalie's face and lips were swollen and bloody, her right eye was bloody and swollen shut, she had bruises on her arms, neck, and legs, and she had a bite mark. There was a fracture in the bone that holds the eye in its socket—a typical

2.

injury from a blow to the face, but one unlikely to result from falling into a pool. Natalie asked Ortega to take her daughter to school. Ortega urged Natalie to call the police and seek medical treatment. Instead, Natalie went to work.

At work Natalie's boss told her to leave work and seek medical attention. Natalie needed the money she would earn and was reluctant to leave. She eventually relented and went to the hospital. Before arriving at the hospital, Natalie called the police. After she arrived at the hospital, hospital personnel also called the police. Officers arrived and spoke with Natalie at the hospital. After she was treated, Natalie went to a local women's shelter.

A couple of weeks later, Salinas wrote a letter to Natalie and a letter to his mother. In the letter to his mother, Salinas asked her to make sure Natalie read the letter he had written to her. Salinas went on to say, "I don't know what or how she feels, if she is going to testify or what. So make sure she don't take it with her, because it's another charge for me if she gives it to the D.A. [¶] … [¶] And find out if she is going to testify against me and go to court. Please find her, mother, so I know if I am getting 50 years or not.… [F]ind her before [the next court date] so I know how to proceed with the court and lawyers and such."

In the letter Salinas wrote to Natalie, he stated:

"Let me start by saying how much I love you and that I'm very, very sorry for what happened between us.… I feel lost, lonely, and like a piece of shit, baby, for hurting you …. I never want to hurt you again in any way …. I have to live with what I did to my other half, baby. I have never acted like that before, baby. To the point where I was so mad because I thought that you had went out with somebody else and fucked me over while staying, sleeping, and loving you was my only wants -- [¶] -- and still are. Please forgive me, Natalie. It's up to you, not me. I promise nothing like this will ever happen again, baby."

Salinas was charged in count 1 with inflicting corporal injury on a cohabitant, a violation of Penal Code section 273.5, subdivision (a),[1] and in count 2 with false imprisonment, a violation of section 236. As to both counts, it was alleged Salinas personally inflicted great bodily injury on Natalie. It also was alleged Salinas had a prior strike conviction and had served prior prison terms following felony convictions in 1996, 1998, and 2003. Salinas pled not guilty and denied all the allegations.

At trial Ortega testified she had had problems with Natalie while Natalie was living in the converted garage. Natalie would take Salinas's pain medication and then act strangely. The day of the incident Ortega remembered asking Salinas to leave during the argument with Natalie. The rest of the night Ortega claimed she heard no commotion, no one in the swimming pool, or anyone screaming for help. Natalie never asked for her help during the argument. Ortega did see Natalie's injuries the next morning.

Salinas testified and acknowledged fighting with Natalie the day of the incident, but denied punching, kicking, biting, or grabbing her. When he came home around 1:00 a.m., Salinas said he attempted to have sex with Natalie. Natalie suggested they go swimming, but she was reluctant to get into the water so he pushed her into the pool. He stated she got out of the pool, went inside the converted garage for a towel, and then came back and jumped into the pool. Salinas claimed Natalie hurt herself when she jumped into the pool.

Salinas admitted writing a letter to Natalie and apologizing for hurting her. He claimed he meant only hurting her feelings and was lying in the letter when he took all the blame. When shown pictures taken by the police of Natalie's injuries when she was at the hospital, Salinas claimed the injuries depicted old scars, hickeys, varicose veins, and razor burns. He also claimed Natalie bruised easily.

---

[1]All further statutory references are to the Penal Code.

The jury found Salinas guilty of count 1, not guilty of count 2, and found the great bodily injury enhancement not true. In a bifurcated proceeding, the jury found the prior strike and prior prison term allegations true. At sentencing, the trial court imposed a total term of 11 years in prison.

## DISCUSSION

Salinas challenges his conviction on the basis of instructional error, contending the trial court erred prejudicially when it failed to instruct the jury with a unanimity instruction. He also contends the trial court erred at sentencing when it imposed a fine of $240, instead of $200, pursuant to section 1202.4, subdivision (b)(1).

## I. Unanimity Instruction

Salinas maintains Natalie testified that multiple acts occurred over a two-hour period in two separate locations, resulting in various injuries, and the prosecutor did not elect among the various acts and injuries. Consequently, the trial court was required to give a unanimity instruction sua sponte. We disagree.

In a criminal case, the jury's verdict must be unanimous. Therefore, where the jury receives evidence of more than one factual basis for a conviction, the prosecution must select one act to prove the offense, or the trial court must instruct the jury it must unanimously agree on one particular act as constituting the offense. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

But, a unanimity instruction is not required if the evidence shows only one criminal act or if multiple acts constitute a continuous course of conduct. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100 (*Stankewitz*).) Multiple acts are part of a continuous course of conduct when they are so closely connected as to form parts of a single transaction, when the defendant offers essentially the same defense to each of the acts, and when there is no reasonable basis for the jury to distinguish among them. (*Ibid.*) Applying this principle here, no unanimity instruction was required.

5.

First, contrary to Salinas's claim the prosecutor did not elect a particular injury as the basis for the count 1 offense, it appears the prosecutor did exactly that in closing argument. The prosecutor noted that Salinas "caused [Natalie] all different types of injuries, *but the minute that he actually inflicted that blow to her eye, that's when the crime was committed.* So with that the People have proven Count 1 which would be the domestic violence." (Italics added.) This election is consistent with the medical testimony elicited by the prosecution -- it focused solely on the injury to Natalie's eye. An alternative to a unanimity instruction is for the prosecution to elect a specific act, which was done in this case. (*People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292.)

Also, the evidence establishes that all of Salinas's acts were made over the course of about one and one-half hours in a single location—Salinas and Natalie's residence. This was a continuous course of conduct that occurred without stopping or abating during the relevant time period. Salinas hit Natalie while in the converted garage, hit her on the way to the pool area, pushed her into the pool, and repeatedly hit and shoved her on the way back to the converted garage. In *People v. Thompson* (1984) 160 Cal.App.3d 220, the appellate court concluded that a violation of section 273.5 contemplated "a continuous course of conduct of a series of acts over a period of time. [Citation.]" (*Thompson,* at p. 224.)

Nor do we view the converted garage and pool area as two separate locations for purposes of this analysis. All of Salinas's acts took place at one location—the residential property where Salinas and Natalie resided. The incident started when Salinas arrived home and demanded Natalie remove all her clothes; the physical violence ended when Salinas instructed her to go to sleep. His stated rationale for the beating was that Natalie "had an ass whipping coming."

Contrary to Salinas's contention here, he did not assert separate defenses against the various injuries, but instead claimed he made none of them and denied battering or physically assaulting Natalie. He dismissed all of Natalie's injuries as old or self-

6.

inflicted. In this context the jurors would have "no reasonable basis … to distinguish between them." (*Stankewitz*, *supra*, 51 Cal.3d at p. 100.) The repeated acts, made at most a few minutes apart and to the same victim, were sufficiently closely connected in time and place to form part of one transaction and thus fall under the continuous course of conduct exception to the unanimity election rule. (*People v. Crandell* (1988) 46 Cal.3d 833, 875.)

We also reject Salinas's assertion that the jury's finding of not true on the great bodily injury enhancement indicates the jury rejected Natalie's testimony about the beating. She testified about the cause of her injuries, documented in numerous photographs and medical testimony. The jury carefully weighed the testimony of the physician regarding the extent of Natalie's injuries, as reflected by the jury's request during deliberations to review that testimony. The jury's finding on the great bodily injury enhancement is an indication of its determination of the severity of the injuries, not the cause.

The jury's not guilty verdict on count 2, the false imprisonment charge, also does not imply any rejection of Natalie's testimony on the cause of her injuries. The verdict reflects the difference in the elements of the two counts and the jury's conclusion the evidence was insufficient to establish Salinas intentionally confined or falsely imprisoned Natalie against her will. Whether Salinas committed false imprisonment is independent of whether he committed corporal injury on a cohabitant. The evidence of false imprisonment was very slight and consisted primarily of Natalie testifying that she *assumed* Salinas would restrain her if she tried to leave to seek help.

The evidence on the charge of corporal injury of a cohabitant was overwhelming and consisted of Natalie testifying to the attack by Salinas, with accompanying photographs and medical testimony. This evidence included testimony from the physician that the injury to Natalie's eye would have been caused by a blow to the face with a fist or a baseball. The injuries were not consistent with falling into a pool. The

7.

contrary evidence consisted only of Salinas's claim that he did not cause any of Natalie's injuries. "[T]he evidence supporting each act was the same—the victim's testimony—so that there was no basis for the jury to conclude that some but not all of the acts took place." (*People v. Ramirez* (1987) 189 Cal.App.3d 603, 613.) The jury's verdict demonstrates that it did not believe Salinas's defense and credited Natalie's and the doctor's testimony.

We conclude the trial court did not err when it did not give a unanimity instruction. (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

## II.     Restitution Fine

Salinas claims the trial court erred in imposing a $240 restitution fine pursuant to section 1202.4, subdivision (b)(1) because the amount exceeds the statutory minimum in effect at the time he committed his offense. He contends the imposition of the $240 fine constitutes a violation of the ex post facto clause.

The imposition of a fine is a discretionary sentencing decision and must be objected to in the trial court or any objection is deemed forfeited on appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 779.) Here, the probation report recommended imposing a section 1202.4, subdivision (b)(1) fine in the amount of $240; there was no objection by Salinas at the time of sentencing. Consequently, Salinas has forfeited this issue.

Regardless, imposition of a section 1202.4, subdivision (b)(1) fine in the amount of $240 does not violate the ex post facto clause. The version of section 1202.4, subdivision (b)(1) in effect at the time of the offense specified a fine of between $200 and $10,000 be imposed in an amount that was commensurate with the offense and at the discretion of the trial court. (Stats. 2005, ch. 238, § 1, ch. 240, § 10.5.) The fine of $240 imposed here was authorized under the law applicable at the time Salinas committed his crime, thus ex post facto principles are not implicated. (See *People v. Zito* (1992) 8 Cal.App.4th 736, 740-741 [where pre-1990 law provided fine could not exceed $10,000,

ex post facto prohibition applied so that fine could not exceed $10,000 for pre-1990 losses].)

## DISPOSITION

The judgment is affirmed.

_____

CORNELL, J.

WE CONCUR:

_____

HILL, P. J.

_____

GOMES, J.