Filed 6/29/26  P. v. Lopez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY GUTIERREZ LOPEZ,<br><br>    Defendant and Appellant. | B340402<br><br>(Los Angeles County<br>Super. Ct. No. BA509496) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kevin Stennis, Judge. Affirmed.

G. Martin Velez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan J. Kline and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

On September 26, 2022, Johan Contreras Bautista and a juvenile we identify as E.J. challenged defendant Anthony Gutierrez Lopez and his younger brother Ricardo to fight.[1] Almost immediately after the fight began, Gutierrez Lopez removed a gun from his waistband and shot and killed the unarmed Bautista. E.J., who was also unarmed, was shot and wounded but survived. Gutierrez Lopez then attempted to flee to Mexico and was apprehended at the border.

The People charged Gutierrez Lopez with the premeditated murder of Bautista (Pen. Code,[2] § 187, subd. (a); count 1) and the attempted premeditated murder of E.J. (§§ 187, subd. (a), 664; count 2). As to both counts, it was alleged that Gutierrez Lopez personally used a firearm (§ 12022.5, subd. (a)). As to count 2, it was further alleged that Gutierrez Lopez personally inflicted great bodily injury (§ 12022.7, subd. (a)).

A jury found Gutierrez Lopez not guilty of murder and attempted murder; it convicted him of the lesser included offenses of voluntary manslaughter (§ 192, subd. (a)) and attempted voluntary manslaughter (§§ 192, subd. (a), 664). The jury found all the firearm and great bodily injury allegations to be true. The trial court sentenced Gutierrez Lopez to seven years in state prison.

Gutierrez Lopez claims we should reverse his conviction because the trial court erroneously excluded various categories of defense evidence from his trial, erroneously indicated it would

---

[1] Because he shares the same surname as the defendant, for ease of reference we refer to Ricardo by his first name. We intend no disrespect.

[2] Unspecified statutory references are to the Penal Code.

permit the prosecution to impeach one of his proposed character witnesses with certain evidence if that witness testified, and gave a jury instruction on mutual combat that was not supported by substantial evidence. We reject these challenges and affirm.

**FACTUAL BACKGROUND**

## A. Prosecution Evidence

A surveillance video camera focused on the intersection of Hoover and 66th Streets in the City of Los Angeles captured the following. On September 26, 2022, around 11:30 a.m., Bautista and E.J. were standing on one of the intersection's street corners near Bautista's car when Guttierez Lopez and Ricardo approached them. The four men moved to the middle of the street where there was a verbal altercation. Bautista and E.J. then returned to Bautista's car and got inside it. Gutierrez Lopez and Ricardo approached the driver's side of Bautista's car. After a period of further verbal exchanges, Bautista and E.J. got out of the car and took off their shirts.

Eventually, all four men again moved to the middle of the street. Neither Bautista nor E.J. had a weapon. Ricardo threw a punch at Bautista, precipitating a fight. Almost immediately after the fight began, Gutierrez Lopez removed a gun from his waistband, pointed it towards Bautista, and fired. Gutierrez Lopez then pointed the gun at E.J. and shot him. Bautista began running away; E.J. fell to the ground. Gutierrez Lopez chased Bautista while holding the gun in his outstretched arm before both men left the area covered by the surveillance camera.

Bautista's cellphone recorded portions of the encounter. The audio of those recordings includes challenges to fight, multiple uses of the word "Crip," and three audible gunshots.

3

Bautista was shot twice, once in the chest and once in the hand, and died at the scene. An autopsy showed that he died from the chest wound. E.J. suffered gunshot wounds to his left arm and hip. He was hospitalized and discharged two days later.

Police arrested Gutierrez Lopez in the days after the shooting following his detention by United States Customs and Border Protection as he attempted to cross into Mexico.

Bautista's father testified that Bautista and Gutierrez Lopez had known each other since elementary school. In the weeks before the shooting, Gutierrez Lopez told Bautista's father that Bautista had stolen a gun from Gutierrez Lopez. Bautista denied doing so, but his father agreed to pay Guiterrez Lopez $600 for the gun in three $200 installments. Bautista's father had made one or two of the payments before his son was killed.

## B. Defense Evidence

### 1. *Gutierrez Lopez's Testimony*

Gutierrez Lopez testified in his own defense. He said that Bautista stole a gun from him a month or two before the shooting. Gutierrez Lopez told Bautista's parents about it and they agreed to make payments for the gun. Bautista was upset that Gutierrez Lopez told Bautista's parents about the theft. To replace the stolen gun, Gutierrez Lopez bought another one "on the streets."

On the day of the shooting, Gutierrez Lopez and Ricardo were out on the street when Bautista and E.J. waved guns through the window of their car and pointed them at Gutierrez Lopez. Bautista's gun looked like the one that he had stolen from Gutierrez Lopez. Bautista and E.J. (who Gutierrez Lopez had never seen before) got out of their car and asked Gutierrez Lopez and his brother where they were from. Gutierrez Lopez

4

understood during the exchange that Bautista had been "put on the Crips," meaning Bautista had to prove himself and put fear into people. Gutierrez Lopez said he was not with (or "from") any gang. The video showed Gutierrez Lopez walking away from Bautista and E.J. at several points only to return to them; Gutierrez Lopez said he did not continue walking away because he was afraid that Bautista and E.J. would follow and continue harassing him. Gutierrez Lopez shot Bautista and E.J. because he was afraid they otherwise would have killed him and Ricardo.

After the shooting, Gutierrez Lopez was fearful Bautista's gang would kill him. Gutierrez Lopez tried to go to Mexico, but the border patrol stopped him and he was arrested. When interviewed by detectives, Gutierrez Lopez never mentioned that Bautista and E.J. had pointed guns at him; an LAPD detective later testified Gutierrez Lopez also did not mention during the interview seeing guns or objects that looked like guns. Gutierrez Lopez falsely told detectives that he did not know where the gun he used to shoot the victims was when he knew his brother had thrown it in the ocean. He also lied when he told detectives there were no issues between him and Bautista.

Gutierrez Lopez authenticated a photograph of him making an "H" with his left hand and giving the middle finger with his right to the camera with the letters "HK" superimposed on the picture. He testified it showed he was "going against [the Hoover gang,] like dissing them in a way." An LAPD officer assigned to gang enforcement later testified that the area where the shooting took place was the border between the territories of the Menlo Park and Hoover gangs, that "HK" stood for "Hoover Killer," and that Gutierrez Lopez's hand signals signified disrespect for the Hoover gang.

2.    *Ricardo's Testimony*

According to Ricardo, he and Gutierrez Lopez used to "hang out" with Bautista. That stopped after Bautista stole the gun, and Bautista held a grudge against Gutierrez Lopez for telling Bautista's father about the stolen gun.

On the day of the shooting, Ricardo and his brother were walking to a grocery store when Bautista and E.J. drove up, almost hit them with their car, and then made a U-turn. Ricardo had never seen E.J. before.

Ricardo saw Bautista and E.J. pointing something at Gutierrez Lopez that looked like a gun. Bautista and E.J. asked Ricardo and Gutierrez Lopez what gang they were from, and they replied that they were not from any gang. E.J. told them that he was a Crip and that Bautista had been "put on" the Crips; Ricardo did not believe that Bautista had in fact been "put on" the Crips.

Ricardo and Gutierrez Lopez continued walking, but Bautista and E.J. kept asking what gang they were from. Bautista and E.J. then asked what Ricardo and Guttierez Lopez had in their pockets, as if they were going to rob them. When Ricardo and Gutierrez Lopez refused to let their pockets be searched, Bautista and E.J. tried to start a fight. Ricardo hit Bautista because he thought Bautista and E.J. would have kept following if he and his brother had tried to walk away. Ricardo knew that his brother had a gun when he got into the fight; he also believed Bautista and E.J. had guns.

After the shootings, Ricardo and Gutierrez Lopez ran away because they were scared. Their sister drove them to the beach, where Ricardo threw the gun into the ocean.

3.    *Other Testimony*

Gutierrez Lopez's mother, his soccer coach, three of his high school teachers, and a high school counselor all testified as character witnesses.[3]  They testified Gutierrez Lopez was peaceful and that they had not seen anything to suggest he was in a gang.

Dr. Scott Fraser, an expert in neuropsychology, testified about the fight-or-flight response.  Based on his review of the surveillance video, Dr. Fraser opined that it was the type of situation that could evoke the fight-or-flight response.

The parties stipulated that E.J. told a detective he was from the Menlo Crips gang.  Greg Estevene testified as a gang expert for the defense regarding a portion of the video taken by Bautista's cell phone where E.J. says, "I want my demo shit" while approaching Gutierrez Lopez and Ricardo.  Estevene opined that, in the context of a gang "hit up," that statement referred to a video of violence that can be published on social media.

## DISCUSSION

### A.    Gutierrez Lopez's Evidentiary Challenges Do Not Warrant Reversal

Gutierrez Lopez contends that we should reverse because the trial court abused its discretion in excluding evidence of his character for honesty, the dangerousness of the neighborhood where the shooting occurred and of the Menlo Crips gang, and that the two victims had drugs in their system at the time of the

---

[3] Gutierrez Lopez had graduated from high school approximately two years before the shooting.

shooting. He also contends the court erred by ruling his father could be cross-examined about a criminal charge pending against him related to the shooting if he testified.

1.    *Standard of Review*

A trial court has broad discretion to determine the relevance of evidence. (*People v. Case* (2018) 5 Cal.5th 1, 33.) We will not disturb the exercise of that discretion unless it was arbitrary, capricious or patently absurd and resulted in a manifest miscarriage of justice. (*Id.* at pp. 33-34.) In addition, we may not reverse a jury's verdict "by reason of the erroneous exclusion of evidence unless . . . it appears of record that" "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a).)

2.    *Character Evidence*

Defendant's soccer coach testified without objection that Gutierrez Lopez was a peaceful person. Before another question was asked, the court called counsel to sidebar and told defense counsel, "[Y]ou can't ask about honesty. Because on cross, he was referred to as lying over and over." Defense counsel responded, "Okay."

On appeal, Gutierrez Lopez claims the court erred in excluding testimony from the soccer coach regarding honesty. This claim is forfeited. First, it is not clear whether defense counsel even intended to ask the soccer coach about Gutierrez Lopez's honesty. One of Gutierrez Lopez's teachers and his mother had already testified as character witnesses; neither was asked about his character for honesty. Nor did the court's statement come in reaction to any proposed question or stated potential area of inquiry. Based on the record before us, it

8

appears to have been entirely sua sponte, and defense counsel did not object but instead agreed with the court.

Even if we assume counsel did intend to ask about Gutierrez Lopez's character for honesty and was prevented from doing so, we have no idea what the soccer coach would have said about that topic because "[t]he substance, purpose, and relevance of the excluded evidence" was not "made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a).)  Because we lack an adequate record to evaluate the claimed error or its potential impact on the verdict, the claim is forfeited.  (*People v. Ramos* (1997) 15 Cal.4th 1133, 1178 [a defendant who "did not make an offer of proof as to the substance of the anticipated testimony . . . fail[s] to preserve the issue" for appellate review].)

3.    *Dangerousness of the Neighborhood*

Prior to trial, defense counsel sought to introduce evidence of "dangerousness in the neighborhood and fear for safety in the neighborhood" where the shootings occurred, arguing it was relevant to explain why Gutierrez Lopez was armed.  The trial court ruled that such evidence was irrelevant.  Defense counsel then provided more specificity about what he intended to elicit on this topic, namely testimony from Gutierrez Lopez's girlfriend about a shooting in her family's home in which one of her brothers shot and killed another brother.  Counsel explained his belief that the evidence was relevant to Gutierrez Lopez's "concern generally about dangerousness and particularly fatal shootings in the neighborhood."  The trial court again ruled that the evidence was irrelevant.

Gutierrez Lopez argues the trial court should have admitted this evidence because it explained why he possessed a

9

firearm at the time of the shooting. The trial court did not abuse its discretion in finding evidence about the intra-family shooting at the girlfriend's home irrelevant. That evidence had no relevance to Gutierrez Lopez's claim that he shot Bautista and E.J. in self-defense or otherwise acted reasonably during the encounter with them. To the extent Gutierrez Lopez sought to introduce any other evidence about the dangerousness of the neighborhood beyond the intra-family shooting, he identifies no proffer or other indication in the record of what that evidence might have been. Because we lack any basis to evaluate the claim, it is forfeited. (*People v. Ramos*, *supra*, 15 Cal.4th at p. 1178.)

4.    *Dangerousness of Menlo Crips Gang*

Guiterrez Lopez contends that the trial court erroneously excluded evidence that the Menlo Crips gang was dangerous. After defendant's gang expert testified that the Menlo Crips was a criminal street gang, the following exchange occurred:

"Q    [Defense counsel]:  Are they dangerous?

"A    Yes.

"[The prosecutor]: I'm going to object to the form of the question.

"The court:  Sustained.

"[The prosecutor]:  Move to strike.

"The court:  Stricken."

Defense counsel did not seek to rephrase and re-ask the question, and instead moved to another topic.

Contrary to Gutierrez Lopez's claim, the court did not exclude evidence that the Menlo Crips gang was dangerous. It sustained an objection to the *form* of a question seeking to elicit such information, not any objection to the *relevance* of that

information.  Defense counsel did not attempt to rephrase the question, or if he thought the court was somehow suggesting the evidence was irrelevant, to explain the relevance and seek a ruling on admissibility.  The claim is thus forfeited.  (*People v. Elder* (2017) 11 Cal.App.5th 123, 134 [failure to obtain ruling on evidentiary matter forfeits issue on appeal].)

     5.    *Toxicology Results*

Guiterrez Lopez contends that the trial court abused its discretion by excluding evidence that Bautista had cannabis, and that E.J. had cannabis and opioids, in their systems at the time of the shooting.  Defense counsel argued this evidence was relevant because, according to the defense gang expert, "it's very common for active gang members to be intoxicated when they are doing the gang business.  And when I say intoxicated, I mean not alcohol necessarily but chemicals in the blood stream or in the brain, like cann[a]bis or opioids.  That actually makes them more dangerous because it inhibits their decision making process." The court excluded the proffered evidence.

Gutierrez Lopez did not present any evidence, either when he testified or through other means, that he believed Bautista and E.J. were under the influence of drugs at the time of the encounter.  The toxicology evidence was therefore irrelevant. (See, e.g., *People v. Tafoya* (2007) 42 Cal.4th 147, 165 [evidence purporting to indicate victim's dangerousness "was relevant to [the] defendant's claim of self-defense only if [the] defendant knew of" that fact and was afraid as a result]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 496 ["the court is not required to admit evidence, such as cocaine or marijuana use, 'that merely makes the victim of a crime look bad' "].)

11

*People v. Wright* (1985) 39 Cal.3d 576, on which Gutierrez Lopez relies, is not to the contrary. In that case, the trial court erred in excluding evidence that a homicide victim had heroin in his system within 24 hours of his death. (*Id.* at pp. 582-586.) The defendant in *Wright* testified that the victim threatened him, was acting irrationally, and might have been under the influence of some drug. (*Id.* at pp. 581-582.) The Supreme Court found the excluded evidence would have supported the defense theory that the defendant shot in self-defense based on his perception of the victim's irrational behavior, and also would have impeached the the prosecution's primary witness, the victim's wife, who had testified that the victim had not used narcotics in the 24 hours prior to his death. (*Id.* at p. 584.) Here, Gutierrez Lopez points to no evidence that he believed the victims' behavior might have been caused by drug use or that he shot the victims in self-defense in response to what appeared to be irrational drug-induced behavior. Nor was the evidence of the victims' drug toxicology relevant for impeachment purposes of some other witness.

6. *Cross-examination of Gutierrez Lopez's Father*

In the same information filed against Gutierrez Lopez, the People charged his father with being an attempted accessory after the fact for helping his son try to cross into Mexico after the shootings. At trial, in addition to the character witnesses that did testify, Gutierrez Lopez intended to call his father to testify that Gutierrez Lopez was a peaceful person. The prosecutor indicated that if the father testified, the prosecutor would seek to cross-examine the father about the facts underlying his alleged help in attempting Gutierrez Lopez escape. The trial court

12

ultimately indicated it would permit such cross-examination. The father never testified at trial.

Gutierrez Lopez contends that the court erred in permitting this potential cross-examination. That claim is forfeited. To preserve a claim of error regarding potential impeachment evidence, the witness at issue must testify at trial and be impeached with the evidence at issue. (*See People v. Collins* (1986) 42 Cal.3d 378.) This is because: (1) "an appellate court cannot review [the trial's court's] balancing process [concerning the probative value of the impeachment against its prejudicial effect] unless the record discloses 'the precise nature of the [witness]'s testimony' " (*id.* at p. 384); (2) "when the [witness] does not testify, the reviewing court . . . has no way of knowing whether the prosecution would in fact have used the [evidence in question] to impeach" (*ibid.*); and (3) "the reviewing court cannot intelligently weigh the prejudicial effect of that error if the [witness] did not testify" (*ibid.*). Because Gutierrez Lopez's father did not testify, we do not know what his father would have said, whether his father would have been impeached and with what specific evidence, and have no basis to weigh the prejudicial effect of any alleged error in permitting the impeachment.

## B. The Court Did Not Err in Giving a Jury Instruction on Mutual Combat

Gutierrez Lopez argues the court erred by instructing the jury on self-defense involving mutual combat. Although defense counsel did not object to the instruction ultimately given to the jury, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) We accordingly review this claim of error even though no objection

13

was made before the trial court. (§ 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *People v. Delgado* (2017) 2 Cal.5th 544, 572, fn. 15.)

The trial court instructed the jury using CALCRIM No. 3471 as follows: "A person who engages in mutual combat has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] AND [¶] 3. He gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self[-]defense arose."

Guiterrez claims this instruction had no application to his case because there was no mutual combat. Instead, "Bautista and E.J. remained the aggressors, repeatedly challenging [Guiterrez Lopez] to fight."

When determining whether substantial evidence supports a jury instruction, we must "view the evidence most favorably to the judgment presuming the existence of every fact that reasonably may be deduced from the record in support of the judgment." (*People v. Jantz* (2006) 137 Cal.App.4th 1283, 1290.) Bautista and E.J. did challenge Gutierrez Lopez and Ricardo to fight. But after these challenges, Ricardo threw the first punch that in fact started the fight, and Gutierrez Lopez joined in

14

almost immediately.  This was evidence from which the jury could have concluded that the fight started by mutual consent or agreement.  Thus, the trial court did not err in giving the mutual combat instruction.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

M. KIM, J.

15