Filed 7/21/16  P. v. Kane CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B264639 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA074423) |
| v. | |
| MICHAEL R. KANE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Martin L. Herscovitz, Judge.  Affirmed.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, David A. Wildman, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Michael Kane in count 1 of first degree murder of his wife, in violation of Penal Code section 187, subdivision (a).[1] The jury also found true the special circumstance that the murder was committed by lying-in-wait, within the meaning of section 190.2, subdivision (a)(15), and that defendant used a deadly weapon, to wit, a knife, in the commission of the offense within the meaning of section 12022, subdivision (b)(1). The jury also found defendant guilty in count 2 of making a criminal threat (§ 422, subdivision (a)), and in count 5 of disobeying a domestic relations court order (§ 273.6).

Defendant was sentenced in count 1 to life in prison without the possibility of parole, plus one year for the use of a knife. The mid-term of two years was imposed for the criminal threats conviction in count 4. Defendant was sentenced to one year in county jail in count 5, which the court stayed pursuant to section 654.

Defendant contends that (1) insufficient evidence was presented to support the lying-in-wait special circumstance; and (2) the lying-in-wait special circumstance is unconstitutionally vague and violates the Eighth Amendment because it is indistinguishable from the lying-in-wait theory of first degree murder.

We affirm.

## STATEMENT OF FACTS

**Dissolution of the Marriage of Defendant and Michelle Kane**

Defendant was married to the victim, Michelle Kane (Michelle).[2] They had a son and daughter. Defendant moved out of the family home in February 2013. Michelle

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] Because there are multiple women named Michelle in this case, for clarity we refer to the victim, Michelle Kane, by her first name.

2

filed for dissolution of the marriage in April 2013. Michelle obtained a temporary restraining order on April 24, 2013, which ordered that defendant not threaten or harass her and authorized her to legally record conversations during custodial exchanges. The restraining order was in effect during the period spanning June 13-15, 2013.

**"The Beast is Hungry" and Other Threats**

As part of a custody agreement, defendant and Michelle exchanged the children in the parking lot of the police station in Topanga on June 13, 2013. Michelle recorded defendant making various threats to her. Defendant said to Michelle, "The beast is hungry. He's ready to feed. You're not going to make it a week. Forget it, we're not making it a week. [¶] . . . [¶] I could snap any second. You ain't got three days. . . . Watch out for me. [¶] . . . [¶] I'll beat you up right here, I'm ready to feed." Defendant said that he had gone "beserk" and was not afraid of the police.

That evening, Michelle sent the recording via email to her attorney, Matthew Skarin. Skarin listened to the recording and filed ex parte notice for an emergency hearing to address child custody and visitation rights. Michelle did not want defendant to have the children for Father's Day weekend, so Skarin sent a copy of the request to the defendant's attorney for notice. Skarin then suggested Michelle take the recording to the police station and notify the police that defendant violated the restraining order.

Michelle went to the police station at 1 p.m., where she spoke with Officer Korina Bovaro about the recorded threats. Officer Bovaro feared for Michelle's safety, so she advised that Michelle obtain a stay-away order, not return home, and stay with friends or family that night. Michelle left the station between 4 p.m. and 5 p.m.

**Purchase of Knives at a Big 5 Store**

At about 10:45 a.m. on June 14, 2013, defendant went to a Big 5 sporting goods store and purchased two hunting knives from assistant manager Blake Blanchard.

3

Defendant paid for both knives with his credit card. The transaction was captured by the store's surveillance cameras.

**Events leading up to the murder**

Also on June 14, Michelle contacted her friend, Michelle Levin (Levin), and explained that she had filed a police report against defendant for violating the restraining order. Michelle was planning on spending the night with her mother in Marina Del Rey, but stopped at the Levin residence beforehand to play the recording for Levin and her husband, Howard (Howard). While Michelle was playing the tape for the Levins, defendant called Michelle and left several voicemails, stating he wanted her to meet him at the family home with the police so he could pick up his belongings. Levin testified that defendant had moved out of the family home in February and already had all of his belongings. Levin said defendant told Michelle he was going to get her when the police were on their break. The Levins advised Michelle that she should not meet with defendant or return his phone calls.

Later that evening, Michelle learned that defendant had stopped at her work around 3:50 p.m. while she was gone. Defendant asked Michelle's coworker, Michelle Rosser (Rosser), to see Michelle so he could drop something off for the children. It appeared he had three pairs of rolled up adult sized jeans in a bag. Rosser told defendant Michelle was home sick with their daughter. Defendant thanked Rosser and left. Michelle called Skarin to tell him defendant had stopped by her work and violated the restraining order a second time. Skarin again advised her to contact the police.

About an hour after her first visit, Michelle returned to the police station and spoke with Officer Bavaro a second time. Michelle explained that she was concerned because defendant had never previously visited her at work. Michelle played a voicemail for Officer Bavaro in which defendant said, "Where are you? I am looking for you. I have a bag of - - a backpack of things, clothing and things that I want to give to the children. You're not at work, I went by there. Where are you?" Officer Bavaro found it

4

bizarre that defendant repeated the same statement several times. Officer Bavaro again advised Michelle not to spend the night at home and to immediately call 9-1-1 if she spotted defendant. Michelle declined staying at a shelter and declined being given information about a shelter.

**Broken Windows at Michelle's Home**

That same night, at about 5:30 p.m., the family's neighbor Ella Isichei and her daughter heard glass breaking at the Kane family home. The two women watched defendant use a rod to smash the home's garage windows and the window above the front door. Isichei wanted to go downstairs and tell defendant to stop, but her daughter begged her not to go. Isichei did not call the police because defendant was smashing the windows to his own family home.

**Defendant Appears at Daycare and Michelle Returns to the Levin's Home**

On June 14, 2013, Michelle intended to pick up clothing and other necessities before going to her mother's house in Marina Del Rey. Michelle was crying when she arrived at her children's daycare that morning. She told the owner, Mary Gossett, that defendant had threatened her and she was scared for her life. Michelle and Levin returned at 6 p.m. to pick up the children. As they drove off, defendant arrived at the daycare and asked for his children. Defendant gave Gossett a hug and told her "he was going to make the Jewish wife happy." Gossett could smell alcohol on defendant and noted that the behavior was unusual. Defendant stated he loved everyone and had no money to give and then accused Michelle of having a male friend. Gossett called Michelle and left a message, expressing her concern that defendant may harm himself. Gossett was worried about both defendant and Michelle.

Michelle, her children, and the Levins ate dinner around 7:30 p.m. at the Levin residence. Michelle asked Howard to escort her to her family home, but he was tired

5

from work, so at about 8 p.m. Michelle and Levin drove to Michelle's home. They immediately noticed the broken window above the garage door. Michelle called the police. The police arrived, checked the home to make sure it was clear, and took a report. Michelle then packed her belongings while Levin tried to clean up the glass. They realized it was past 10:00 p.m. and Levin asked that Michelle and her children stay at the Levin residence for the night instead of making the drive to Marina Del Rey.

When they returned to the Levin residence, Michelle put her daughter to bed. Her son was having difficulty falling asleep. She decided to put him in the car and drive him around so that he would fall asleep. At approximately 11:30 p.m., while Michelle was out driving her son, Levin received a phone call from Michelle's home alarm company. Levin was the emergency contact if the company could not reach Michelle directly. Levin gave the company permission to dispatch the police to Michelle's home. Michelle returned to the Levin residence to drop off her son, then left on her own to meet the police at her home.

Officer Albert Medrano met Michelle at her home and noticed that in addition to the broken glass, it looked like someone had bent the front door frame. Officer Medrano could tell Michelle was scared and wanted to leave the area as soon as possible. After speaking with Officer Medrano, Michelle returned to the Levin residence at about 1:00 a.m. and spent the night.

**Defendant's Strange Behavior**

Angela Means lived in the same apartment complex as defendant in June 2013. Means knew defendant for a few months. She would see defendant smoking as she walked her dog. Means and defendant were friendly and they would talk about Michelle. Defendant told Means that he was very upset about how things were going and that his children were a "sore spot." Means stated that defendant was always very fidgety, anxious, and frustrated. Almost every conversation they had was about his marriage and divorce.

6

Means spotted defendant in the back stairwell of their building before 6:00 a.m. on June 15, 2013. Defendant's hair and posture were different than usual. He seemed very calm and at peace. With a smile and chuckle, defendant told her that the divorce was getting rough. This behavior disturbed Means, so she told defendant she had to leave. Defendant then picked Means's dog up, brought it close to his face, and said, "goodbye." Means thought defendant was going to kill himself and the encounter made her uneasy for the whole morning.

**The Murder of Michelle by Defendant**

Howard went to a 7-Eleven convenience store at about 6:30 a.m. on the morning of June 15, 2013. When Howard returned home he decided to park his car across the street because Michelle's car was in the driveway. Michelle's car had a personalized license plate that read, "Texan Girl." He walked into his home and noticed Michelle on the phone with the insurance company. He told Michelle he admired her brave and calm behavior after all that had happened to her in the past couple of days.

Howard went into his office to play with Michelle's daughter. At close to 8:00 a.m. Levin shouted, "Someone's at the door." Howard looked through the door's peep hole and saw defendant, who was smiling. While Howard owns a pistol, he did not retrieve it. Howard opened the door, stepped outside, and closed the door behind him without locking it. He asked defendant what he was doing there. Defendant calmly replied that he had always considered the Levins friends of the family and he stopped by to check on the well-being of the children. Howard told defendant he needed to go home and get some rest, but defendant kept changing the subject. Howard mentioned the broken windows and told defendant he should go to the family home and help pick up the glass so no one would get cut. Defendant changed the subject, saying someone had broken his car window. Howard leaned over to look at defendant's car window, but felt like he was being distracted because the direction defendant was pointing required Howard to move toward the street and away from the front door. Defendant looked at his

7

wrist and then told Howard he had to speak with Michelle for a second. Howard replied, "That's not going to happen." Howard did not see anything in defendant's hands during their conversation.

While Howard was outside talking to defendant, Levin looked through the peep hole, noticed defendant, and told Michelle to call 9-1-1. Michelle was nervous, but kept calm during the phone call to 9-1-1. Michelle said to Levin, "I hope Howard can keep [defendant] here long enough for the police to come and arrest him."

The conversation between Howard and defendant went silent. Defendant quickly reached for the door handle, catching Howard by surprise. Howard and defendant fought over the door handle, but defendant overpowered Howard and broke into the house, leaving Howard on the floor. Defendant did not say anything and darted straight to Michelle. Howard yelled, "Call 911!" Levin said that she called 9-1-1, thinking it would deter defendant, but he sprinted past her towards Michelle. Michelle tried to back away from defendant, but he got close to her and punched her with an underhand motion, saying nothing while doing so. The Levins did not realize at the time that defendant was stabbing Michelle.

After defendant punched Michelle three times, Howard came around the corner and bear-hugged defendant from behind. The two men struggled before falling to the ground. Howard yelled out to both women to run and call 9-1-1. Howard realized defendant had a knife.[3] Michelle and Levin ran to a neighbor's house. Levin banged on the neighbor's door while Michelle stayed on the lawn, hunched over and holding her stomach. Michelle said, "He got me. He got me. . . . He stabbed me." Michelle apologized to Levin by stating, "I'm sorry. I didn't think he knew where you lived."

Defendant ran out of the Levin residence, down their driveway, and headed toward the area where Michelle and Levin were standing. Michelle ran into the street, trying to avoid defendant as he was throwing right hook punching motions towards her. Levin noticed her husband run out of the house. He tripped at the bottom of his driveway.

_____

[3] The knife used in the assault was one of the knives purchased at the Big 5 store.

When she turned around, defendant was on top of Michelle, straddling her, stabbing her repeatedly from her head all the way down her waist.

Levin ran back into her home, locked the door, set her alarm, and called 9-1-1. Howard went into the kitchen, thinking he needed to get a weapon, and instead washed blood from a cut on his hand, retrieved a towel, and walked outside to help Michelle, but she had already died.

**Evidence Recovered and Autopsy Results**

Detective David Peteque arrived on the scene at 9:25 a.m. and immediately secured the crime scene. He found a black folding knife, laying in the street, next to Michelle's body.

The autopsy report revealed that Michelle had been stabbed in the face, chest, abdomen region, back, and upper extremities. The coroner testified that in his opinion, the death was homicide by multiple sharp force injuries. Both lungs had been penetrated and Michelle's trachea had been stabbed as well. The coroner identified 41 knife wounds on Michelle's body.

**Defense Evidence**

Jennifer Richter was a friend of Michelle's; Richter described their relationship as being "the best of friends." Richter sent Michelle a text message on June 15, 2013. She socialized primarily with Michelle and the two children, and defendant was invited to a birthday party for Richter's husband. Defendant did not like the way someone at the party spoke to him and uttered something rude in response. Michelle disclosed to Richter that defendant was seeing a psychiatrist and was supposed to be on medication, but he often failed to take his medicine or show up for his appointments. Richter testified that she saw defendant be verbally abusive to Michelle on several occasions. She had never seen defendant be physically abusive to her. Michelle told Richter that defendant

9

threatened to hurt and kill her.  Michelle said defendant threatened to behead her.

Michelle at one point called Richter and told her that defendant had accused Richter's husband of smashing his car window.  Michelle also said that defendant alleged she and Richter were having a lesbian relationship, which was untrue.

Defendant's medical records from Olive View Medical Center were admitted into evidence, including a number of different prescribed medications.  Dr. Ronald Markman, a psychiatric expert witness for defendant, explained the uses of several drugs, including drugs prescribed for atypical antipsychotic behavior, bipolar disorder, schizophrenia, anxiety, and depression.

## DISCUSSION

### Sufficiency of the Evidence of the Lying-In-Wait Special Circumstance

Defendant contends the prosecution failed to present sufficient evidence to support the lying-in-wait special circumstance finding.  He argues that the elements of lying-in-wait are not supported by the evidence because defendant did not conceal his intent to kill Michelle, nor did he engaging in a period of watching and waiting.  We disagree.

#### *Standard of Review*

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support the [the conviction].'  [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"'Although it is the duty of the jury to acquit a defendant if it finds that

10

circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]'" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

### *Elements of the Lying-in Wait Special Circumstance*

Section 190.2 provides in pertinent part: "(a) The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if . . . [¶] . . . [¶] (15) [t]he defendant intentionally killed the victim by means of lying in wait." "'The lying-in-wait special circumstance requires "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . ." [Citations.]'" (*People v. Moon* (2005) 37 Cal.4th 1, 22 (*Moon*).)

#### *Concealment of Purpose*

"[An] element of the lying-in-wait special circumstance is that the murderer act by means of concealment." (*People v. Arellano* (2004) 125 Cal.App.4th 1088, 1095 (*Arellano*).) "'[P]hysical concealment from, or an actual ambush of, the victim is not a necessary element of the offense of lying-in-wait murder.'" (*Ibid.*) Concealment is established by substantial evidence """"that a defendant's true intent and purpose were concealed by his actions of conduct. It is not required that he be literally concealed from view prior to his attack.""" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 500[].)" (*People*

11

*v. Stevens* (2007) 41 Cal.4th 182, 202.)

Relying on his conduct in the days prior to the killing, defendant contends he did not conceal his purpose or intentions from Michelle. Defendant points to the statements recorded by Michelle that "the beast is hungry" and she "was not going to make it a week." Michelle responded by obtaining an emergency stay-away order and reporting the statements to the police. Defendant points out that Michelle told others defendant intended to kill her. She did not stay at home in an attempt to avoid defendant. From these circumstances, defendant reasons that Michelle was well aware of his intent, and the element of concealment is accordingly not supported by substantial evidence.

Defendant's persistent threats prior to the murder do not negate the element of concealment of purpose. (*Arellano*, *supra*, 125 Cal.App.4th at p. 1095.) In *Arellano*, the defendant warned his ex-wife for months that he intended to kill her, harassed her at work, and made threatening phone calls, including a call on the night of the murder. (*Ibid.*) The *Arellano* court rejected the defendant's contention that the victim was aware of his purpose on the night of the murder based on the defendant's prolonged history of threats of violence: "While a victim of domestic violence and continuing death threats might well suspect she will be attacked sometime in the future, she has no way of knowing exactly when or where that attack will occur. The very fact Arellano *repeatedly* told [the victim] her death was imminent tended to dilute the effect of those warnings. Indeed, [the victim's sister] testified [the victim] pointedly refused to curtail such activities as going to the movies in the face of Arellano's continual death threats. We conclude Arellano's death threats did not negate the surprise element of lying in wait." (*Ibid.*; accord *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1291 ["prior threats to the victim do not necessarily negate the concealment and surprise elements of murder by lying in wait" and "[a] victim of threats and domestic violence may be fearful of further violence, but is not charged with notice that he or she might be murdered"].)

The following circumstances demonstrate that Michelle, as well as the Levins, were unaware of defendant's homicidal purpose for appearing at the Levin residence. Howard described defendant's appearance at the door as "smiling, pretty relaxed

12

looking." Howard went outside, thinking he would simply talk to defendant and tell him he should not be there due to the restraining order. He neither locked the door to the house nor armed himself with the firearm he had in the home. Defendant said he stopped by to check on the well-being of the children, sounding "very, very calm and very nice." Defendant's tone remained calm, even as Howard told him he had to stop his conduct and to go home. Howard felt like defendant was manipulating him by not answering his questions and denying that he broke windows at the home the previous night. It was not until defendant distracted Howard by directing him to look at his car window that defendant moved to gain entry to the house. At no point outside did Howard see a knife in defendant's hand. Howard explained he "never thought that he was going to break in and stab her to death."

When Levin saw that was defendant outside her home, she advised Michelle to call 9-1-1, who did so. Michelle remained calm but was nervous. Michelle said she hoped Howard could keep defendant at the location long enough for the police to arrive and arrest him. She also apologized to Levin for defendant being at her house. Levin did not hear any noise from outside, confirming Howard's version of the calm nature of his conversation with defendant. Levin and Michelle stayed in the kitchen, having a conversation, waiting for the police to arrive. The calm was broken when "the door flew open. You could see my husband fell into the house, like, holding the door. And [defendant] just ran right over him, past me at Michelle." Defendant then stabbed Michelle with a motion "like, an underhanded punch with his left hand."

Further, defendant argues that he clearly and unequivocally disclosed his intent to kill Michelle. However, the evidence presented at trial can reasonably be interpreted that he concealed his intent to imminently kill Michelle up until the moment he rushed past Howard to stab Michelle. According to Richter, Michelle disclosed that defendant had threatened to hurt and kill her, including a threat to decapitate her, at some point in the past. However, defendant had never been physically abusive to Michelle. As in *Arellano*, defendant's continued harassment and threats diluted the effect of any threats he made leading up to the murder, concealing his true intentions from his victim.

13

Further, defendant's comments that he was "ready to feed" and that "we're not making it a week" were not explicit threats to kill her. At the time he made these threats, he made no moves to harm Michelle. While Michelle was clearly scared and went to the police for help, a jury could reasonably believe that Michelle may have feared for her safety but not for her life. A jury could reasonably believe that Michelle thought these comments were part of a larger pattern of harassment, and not an explicit threat to kill her. Michelle could have also viewed defendant's bizarre behavior as symptoms of his mental illness, rather than an express threat to kill her. Michelle's actions leading up to her murder support an inference that she did not believe her murder imminent, and thus defendant concealed his true intent from her. Detective Bovaro advised Michelle to go to a shelter, but Michelle declined and refused to receive any information about a shelter, instead planning to go to her mother's home.

The testimony of the Levins and Michelle's responses to defendant's actions constitute substantial evidence that defendant successfully concealed his homicidal intent up until the moment he forced his way into the house. Neither the Levins nor Michelle acted as if what was taking place was anything more than defendant's ongoing harassing behavior. A rational trier of fact could conclude that defendant concealed his true intent for purposes of the lying-in-wait special circumstance.

### *Watching and Waiting*

Defendant next argues he did not watch and wait for an opportune time to attack Michelle. Defendant reasons that Michelle knew that he had been looking for her, he intended to hurt her, and she was aware defendant was outside of the Levin residence. Defendant's approach to the house, he argues, was "in full view of many witnesses and [he] announced his arrival." This is not correct, as substantial evidence supports the element of watching and waiting.

The lying-in-wait special circumstance requires a substantial period of watching and waiting for an opportune time to act. (*Moon*, *supra*, 37 Cal.4th at p. 22.)

14

"'Watchful' does not require actual watching; it can include being 'alert and vigilant' in anticipation of the victim's arrival to take him or her by surprise. [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 247 (*Streeter*).) Our Supreme Court has never fixed a minimum time period for watching and waiting. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073.) What is required in not a precise period of time, but a period of watchful waiting that is substantial. (*Ibid.*, citing *Moon*, *supra*, at p. 23 ["a few minutes can suffice"].) Even a "relatively short" period of watching and waiting can be sufficient to satisfy the element. (*Moon*, *supra*, at p. 24.) "Although we have held the period of watchful waiting must be 'substantial' [citation], we have never placed a fixed time limit on this requirement. Indeed, the opposite is true, for we have previously explained that '[t]he precise period of time is also not critical.' [Citation.] Even accepting defendant's testimony that he waited only a few scant minutes before killing [the victim], a few minutes can suffice. [Citation.]" (*Id*. at p. 23)

Substantial evidence supports a finding that defendant watched and waited for a substantial period of time before seizing the opportunity to get past Howard and enter the house for the purpose of killing Michelle. Defendant had reason to believe Michelle was in the home, because her car with a personal license plate was in the driveway. Defendant arrived at the Levin residence with the knife he had recently purchased, but he kept the weapon concealed. Defendant calmly engaged in conversation with Howard, who tried to convince him to change his harassing behavior and return home. Defendant was non-responsive to some of Howard's statements, prolonging his presence. He distracted Howard by directing him to a broken window on his car, waiting for an opportunity to get past Howard and enter the Levin residence. Defendant was at the location long enough to satisfy the requirement of watching, and he waited for the moment he felt he could gain entry by surprise. This is sufficient to satisfy the second element of the lying-in-wait special circumstance.

**Constitutionality of the Lying-in-Wait Special Circumstance**

15

Defendant contends the lying-in-wait special circumstance is unconstitutionally vague and overbroad in violation of the Eighth Amendment because it is indistinguishable from the lying-in-wait theory of first degree murder. Based on this premise, defendant argues the special circumstance "is unconstitutionally vague and creates an artificial application of the death penalty by failing to narrow the class of death [penalty] eligible defendants." We reject the contention.

First, we agree with the Attorney General that defendant lacks standing to make this argument because the prosecution did not seek the death penalty as punishment in this case. In other words, defendant is making a vagueness argument that has no impact on him. "'""The rule is well established . . . that one will not be heard to attack a statute on [vagueness] grounds that are not shown to be applicable to himself and that a court will not consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations." [Citations.]'" (*In re Perdue* (2013) 221 Cal.App.4th 1070, 1077-78.)

Second, our Supreme Court has repeatedly rejected the merits of defendant's contention. "As we said in *People v. Carasi* (2008) 44 Cal.4th 1263, 1310 (*Carasi* ), '[T]he lying-in-wait special circumstance . . . is limited to intentional murders that involve a concealment of purpose and a meaningful period of watching and waiting for an opportune time to attack, followed by a surprise lethal attack on an unsuspecting victim from a position of advantage.' (See [*People v.*] *Morales* [(1989)] 48 Cal.3d [527,] 557.) Defendant acknowledges we have differentiated between the lying-in-wait special circumstance and lying in wait as a theory of first degree murder on the bases that the special circumstance requires an intent to kill (unlike first degree murder by lying in wait, which requires only a wanton and reckless intent to inflict injury likely to cause death) and requires that the murder be committed 'while' lying in wait, that is, within a continuous flow of events after the concealment and watching and waiting end. ([*People v.*] *Michaels* [(2002)] 28 Cal.4th [486,] 517; *Morales, supra,* at p. 558.) Contrary to defendant's argument, the lying-in-wait special circumstance is not coextensive with

16

either theory of first degree murder; it does not apply to all murders and is not constitutionally infirm. (*Streeter*, *supra*, 54 Cal.4th at p. 253; see *People v. Johnson* (2016) 62 Cal.4th 600, 635–637.)" (*People v. Casares* (2016) 62 Cal.4th 808, 849.)

## DISPOSITION

The judgment is affirmed.


KRIEGLER, Acting P.J.

We concur:


BAKER, J.


RAPHAEL, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.