[No. B170571. Second Dist., Div. Three. Dec. 16, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
SERVANDO ARELLANO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*The portions of this opinion to be deleted from publication are part 1 of the Discussion on page 1093, and parts 3 through 8 of the Discussion on page 1096. [There is no change in the judgment.]

## COUNSEL

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Michael C. Keller and Lauren E. Dana, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendant and appellant, Servando Arellano, appeals from the judgment entered following his conviction, by jury trial, for special circumstances murder (lying in wait), premeditated attempted murder, making criminal threats (5 counts), disobeying a restraining order (4 counts), and stalking, with firearm-use enhancement findings (Pen. Code, §§ 187, 190.2, subd. (a)(15), 664, 422, 273.6, 646.9, 12022.5, 12022.53).[1] Sentenced to state prison for life without possibility of parole, plus 49 years and 8 months to life, he contends there was trial and sentencing error.

The judgment is affirmed as modified.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established the following.

### 1. *Prosecution evidence.*

Angelica Arellano married defendant Servando Arellano in 1997, when she was 17 years old. After having a son, they separated sometime around September 2001. Angelica ultimately went to live at her parents' house, on 81st Street, just before the Arellanos's second son was born. Angelica lived with her parents until she was murdered on June 8, 2002.

Arellano's sister, Julissa, saw him assault Angelica several times. She once saw Arellano hit Angelica during an argument at a time when Angelica was pregnant. Arellano once hit Julissa in the face when she tried to prevent Arellano from striking Angelica. On another occasion, Angelica telephoned Julissa, said she and Arellano were fighting, and asked Julissa to take her to Julissa's house in Pasadena. Julissa did so. When Arellano telephoned to ask where Angelica was, Julissa lied and said she didn't know. But Arellano came over later that night and, when he discovered Julissa had lied, he pointed a gun at her and said, "I should shoot you right now." Angelica managed to calm him down.

Angelica got a restraining order against Arellano in December 2001, but he continued to make threatening telephone calls. On April 4, 2002, police responding to Angelica's house found Arellano on the property in violation of the restraining order. On May 8, 2002, Angelica told police Arellano had accosted her in the parking lot of Southwest College, where she was a student, and said, "Just wait until you're alone. I am not afraid to go to jail."

Between May 13 and May 24, 2002, Arellano left a series of threatening messages on Angelica's phone machine. He said he was going to get a gun and kill her. Among his threatening statements were the following: "I am going to catch you slipping when your [*sic*] not with the kids. . . . I'll catch you slipping, I'll catch you slipping when you by yourself, I am not stupid." "I am right here by the 99 Cents Store. I'll wait for you in the mornings. I'll catch you in the morning, I'll catch you later on tomorrow or some other day." "So I am waiting for you tomorrow after you drop off Ernesto [their son] for school. I will just wait for you whenever I catch you." "Next time I see you I am going to smoke your ass man." "[L]ike I said, you are going to make me payments." "[F]our people you really love in this world. They're going down."

Sometime between May 31 and June 1, 2002, Angelica's car was vandalized, and she believed Arellano had done it.

When Angelica started working at a Staples store in February 2002, she told the manager, Karen Rutherford, about the restraining order and her domestic situation. Arellano sometimes showed up at the store looking for Angelica and, in late May, he was verbally abusive when Rutherford told him Angelica would not be working that day. On May 28, Angelica got upset when Arellano called her at the store, so Rutherford said she would take Arellano's calls. When he called back and asked to speak to Angelica, Rutherford said she was unavailable. Arellano reacted by threatening to kill Rutherford and all her employees. Rutherford testified Arellano "said if I don't start cooperating with him he is going to come down and shoot me and everybody else." Rutherford was scared and called the police.

On June 7, 2002, Angelica and her sister Daisy went to the movies. Angelica gave Daisy her cell phone, which Daisy wore on her left hip. While they were waiting for the movie to start, Arellano left messages on Angelica's cell phone. Angelica and Daisy listened to one message in which Arellano complained about not being able to see his children and about Angelica going out with other men. Arellano said, "Just wait until I get my turn though," and "Your time is coming though man. Your time is coming." Arellano had called Angelica's house earlier that night and asked to speak to his son. When Angelica's mother refused, Arellano responded by saying "he was going to kill [Angelica]."

The movie ended about 11:30 p.m. Angelica and Daisy arrived home shortly after midnight. Daisy testified she did not see anyone on the street when Angelica turned onto 81st Street, entered the driveway and parked. They talked for a few minutes. Daisy did not see anyone in the driveway area during that time. Just as she and Angelica were opening the car doors, Daisy heard three loud noises. She shut her eyes. When she opened them, she saw that the cell phone on her hip had exploded and that Angelica's face was covered with blood. Angelica had sustained three gunshot wounds, two of which, one to the face and one to the chest, were fatal.

Francisco Perez, who lived across the street from Angelica's house, had been sitting by his front window that night. He initially saw Arellano walking back and forth about 20 minutes before Angelica and Daisy returned from the movie. Perez saw Angelica drive up. He saw Arellano approach the car, go up to the driver's side door and start shooting. Arellano then fled on foot.

Pedro Rodriguez had once worked at a restaurant with Arellano. The day after Angelica was murdered, Arellano called and asked for a place to stay. Although Rodriguez refused, Arellano showed up saying he had no place to go. Rodriguez put him up for one night and then checked him into a motel. Rodriguez later discovered that a bag Arellano left behind had a gun in it, and he notified the police. After his arrest, Arellano called Rodriguez from jail several times and insisted that Rodriguez visit him. When Rodriguez refused, Arellano indicated he wanted to use Rodriguez as an alibi. Rodriguez testified Arellano said if Rodriguez refused to cooperate, "his homies was going to smoke me."

2. *Defense evidence.*

A housekeeper who worked at the former Days Inn in Long Beach recognized Arellano as someone she had seen at the hotel several times. In 2002, she saw him with a woman and a little child. Estela Mendoza also worked at the Days Inn in Long Beach. She had seen Arellano two or three times in 2002. She did not recall ever seeing Arellano with a woman.

## CONTENTIONS

1. The lying-in-wait special-circumstance statute is unconstitutional.

2. There was insufficient evidence to support the lying-in-wait special-circumstance finding.

3. There was insufficient evidence to support the verdict of premeditated attempted murder.

4. Imposition of consecutive sentences on counts 6, 10 and 11 violated section 654.

5. Imposition of a firearm use enhancement under section 12022.53 was improper.

6. An incorrect sentence was imposed for the premeditated attempted murder conviction.

7. A parole revocation fine was improperly imposed.

8. An aggravated term was imposed in violation of the *Apprendi/Blakely* rule.

## DISCUSSION

1. *Lying-in-wait special-circumstance statute is constitutional.** *

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *Sufficient evidence of lying-in-wait special circumstance.*

Arellano contends there was insufficient evidence to sustain the lying-in-wait special-circumstance finding. This claim is meritless.

■ "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

■ One element of the lying-in-wait special circumstance is that the victim be taken by surprise, even if the victim is aware of the murderer's presence. Arellano argues Angelica could not have been taken by surprise because "he had forewarned her for months on end that he was going to 'smoke her' and that he would go anywhere to accomplish his mission. The telephone calls and harassment were non-stop. He even called her that night

---

*See footnote, *ante*, page 1088.

on the cell phone [and] complained about her mother not allowing him access to their children and how she was going to get 'hers.' " Arellano argues he "was hell bent on killing Angelica and she knew it."

The Attorney General replies: "[F]ollowing appellant's analysis, anyone who has made any prior threats to a potential victim would not be accountable for murder by means of lying in wait and would insulate himself. This could not be the state of the law. Clearly, the focus is on the element of surprise and the defendant's conduct and intent at the time of the incident."

■ We agree. While a victim of domestic violence and continuing death threats might well suspect she will be attacked sometime in the future, she has no way of knowing exactly when or where that attack will occur. The very fact Arellano *repeatedly* told Angelica her death was imminent tended to dilute the effect of those warnings. Indeed, Daisy testified Angelica pointedly refused to curtail such activities as going to the movies in the face of Arellano's continual death threats. We conclude Arellano's death threats did not negate the surprise element of lying in wait.[4]

■ Another element of the lying-in-wait special circumstance is that the murderer act by means of concealment. Arellano argues there was insufficient evidence of concealment because he was seen on the street shortly before the murder by Angelica's neighbors. However, "physical concealment from, or an actual ambush of, the victim is not a necessary element of the offense of lying-in-wait murder. (*People v. Sutic* (1953) 41 Cal.2d 483, 492 [261 P.2d 241] [concealment in ambush unnecessary]; *People v. Tuthill* (1947) 31 Cal.2d 92, 100–101 [187 P.2d 16] [victim aware of defendant's physical

---

[4] "[I]n domestic violence cases, decisions to kill are often made quickly and often there are long-standing emotional issues involved. In such situations, murders are not always planned long in advance and executed pursuant to a preexisting plan. Nevertheless, where a defendant makes a decision to kill, conceals his purpose, watches and waits, and takes the victim by surprise, the murder was accomplished by means of lying in wait." (*People v. Superior Court (Lujan)* (1999) 73 Cal.App.4th 1123, 1128 [87 Cal.Rptr.2d 320]; see also *U.S. v. Downs* (8th Cir. 1995) 56 F.3d 973, 977 [rejecting defendant's argument his history of domestic violence toward murder victim precluded any inference of premeditation from fact he brought guns to the murder scene: "Essentially, Downs argues that because he made violent threats against [the victim] with guns in the past, the district court can only infer from the evidence an intention to make further violent threats. We reject this contention as meritless. Among other things, such a rule would shield all habitual batterers and abusers from prosecution for first-degree murder. However common, repeated acts of domestic violence cannot inoculate a defendant against the inference that the careful preparation of firearms signaled an intent to commit murder."].)

presence prior to attack]; *People v. Byrd* (1954) 42 Cal.2d 200, 208–209 [266 P.2d 505] [defendant waited for four hours in front of his former wife's home, entered it, conversed with her, and shot her]; *People v. Sassounian* (1986) 182 Cal.App.3d 361, 407 [226 Cal.Rptr. 880] [concealment of defendant's purpose is sufficient] . . . .) [¶] . . . [¶] . . . 'The concealment which is required, is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.] It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct.' " (*People v. Morales* (1989) 48 Cal.3d 527, 554–555 [257 Cal.Rptr. 64, 770 P.2d 244].)

■ The evidence demonstrated Arellano was watching and waiting for Angelica to return home, that he was lurking close to her house and, after she drove up, that he approached and started shooting while Angelica was still sitting in the car. Arellano's phone message at 9:30 p.m. the night of the murder contains apparent references to the birthday party being held for his sister's child at Angelica's house that day, and to the fact Angelica went out with Daisy, leaving the children with her mother.[5]

These comments raised the inference Arellano had been watching the house that day. Perez's testimony shows Arellano was lurking around Angelica's house 20 minutes before Angelica and Daisy returned from the movie, and that after the car pulled up he approached and shot Angelica before she got out. Daisy testified she did not see anyone in front of the house as the car drove up the street; nor did she see anyone walk up to the car as it sat in the driveway. Daisy was unaware there was any danger until she heard the gunshots. There was sufficient evidence of concealment.

3.–8.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[5] In his phone message Arellano said, "So you are over there getting our party on right. That's all right, that's all good," and "So get your fun whatever, leave my fucking kids at your moms [*sic*] house while you go getting your party on."

[*]See footnote, *ante*, page 1088.

## DISPOSITION

The judgment is modified to reflect a sentence of life, rather than life without possibility of parole, for the premeditated attempted murder conviction (count 2). As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting this change and forward it to the Department of Corrections.

Kitching, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 27, 2005.