Filed 9/29/25  P. v. Zesk CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082544 |
| v. | (Super.Ct.No. RIF2010146) |
| DARREN PETER ZESK, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge.  Affirmed.

Exum Law Offices, Darryl L. Exum; and Arsany A. Said, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance C. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Susan Elizabeth Miller and Alana R. Butler, Deputy Attorneys General, for Plaintiff and Respondent.

1

Darren Peter Zesk (Defendant) (age 19) and his nephew Jared Zesk (Jared) (age 18) went to a house party in Moreno Valley with two other friends.  During the party, an altercation occurred between Defendant, Jared, and another party goer, Massai Cole (the victim).  Defendant and Jared left the party in Defendant's car, stating they would return to shoot up the party.  Defendant and Jared later returned to the party with a firearm.  Jared stayed outside by the car while Defendant returned to the party walking into and out of the party house four times.  Then Defendant walked to the backyard of the house and approached the victim, asked the victim to follow him to the front of the house where Jared was waiting to fight the victim one-on-one.  The victim followed Defendant, but before the victim and Defendant reached the front yard, the victim stopped to speak to someone along the side of the house.  As the victim spoke to the individual, Defendant turned around and shot the victim three times, killing him.

Defendant was charged with murder (Pen. Code[1] § 187, subd. (a)) and discharging a firearm causing death (§ 12022.53, subd. (d)), along with a lying-in-wait special circumstances allegation.  (§ 190.2, subd. (a)(15).)  However, a grand jury was convened, after which a second special circumstances allegation was added that the murder was motivated by the hatred for the victim's race.  (§ 190.2, subd. (a)(16).) A jury convicted Defendant of first degree murder with a true finding on the firearm discharge enhancement and the lying-in-wait special circumstances allegation.  The jury could not

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

reach a verdict on the hate crime special circumstances allegation. Defendant was sentenced to life without the possibility of parole for the murder, plus 25 years to life for the gun discharge enhancement. Defendant appeals.

On appeal, Defendant argues (1) the court erred in admitting evidence of a YouTube video with racist content; (2) the court erred in refusing to instruct the jury on the lesser offense of voluntary manslaughter; (3) the court erred in denying Defendant's new trial motion on the ground of erroneous intent to kill instruction; (4) the court erred in refusing to exclude cell phone and social media content that was racially inflammatory; (5) the court gave erroneous instructions on intent to kill (repeating issue no. 3)[2]; (6) the verdict was contrary to the law or evidence; and (7) there is insufficient evidence to support the verdict on the lying-in-wait special circumstances allegation. We affirm.

## BACKGROUND

On January 31, 2020, Defendant and his nephew Jared, went to a house party in the city of Moreno Valley. Jared was wearing a red sweatshirt with a white number four and Defendant was wearing a darker shirt with a large logo covering the entire front. While at the party, either Defendant or Jared broke a bottle and refused to clean it up, as a result of which they were both asked to leave, but refused to go, and the person who dropped the bottle got a little rowdy. The victim did not like that, and an altercation occurred between the Defendant, the victim and Jared, and possibly others at the party.

---

[2] We will address the two issues as one.

Jared got the worst of it. Defendant stated, "I'm going to shoot up the party," and then Defendant and Jared left the party in Defendant's car.

Just before 12:29 a.m. on February 1, 2020, after Defendant and Jared left the party, Anthony Tapia received a message from a person at the party regarding some sort of threat that was called in to the party. The information was communicated over social media[3] that "they" were going to come and shoot up the party. Tapia talked to the person who first heard of the threat (through Instagram) and obtained a telephone number. Tapia was not sure if the information was a credible threat or not, so Tapia dialed the phone number given to him by the person who first received the message.

After leaving the party, Defendant and Jared went to their grandparents' house in Riverside, where they spent a little bit of time before driving back to the party in Defendant's car.[4] Defendant changed his clothes from earlier and was now wearing a blue flannel jacket or shirt with a black hood. They drove back to the party and arrived around 1:40 a.m. Defendant parked down the street and headed back to the party while Jared stayed by the car. Defendant walked into the party and back outside several times, before going into the backyard of the party.

When Defendant encountered the victim, Defendant told the victim that Jared was outside, and if the victim came to the front of the house, he could fight Jared one-on-one.

---

[3] The message was linked to a telephone number later identified as Defendant's telephone number.

[4] Officers were able to track Defendant's movements through the geolocation (GPS) capability of his cell phone, which the officers had obtained.

4

Defendant and the victim walked around to the side of the house. While on the side of the house, the victim started talking to someone. As the victim talked to the person, Defendant turned around and fired three shots at the victim, who had his back to Defendant. Defendant had his gun down by his hip and shot the victim in the back, stomach, and elbow. Before shooting the victim, Defendant said "something something N word."[5] Someone also yelled, "N word gonna fight, N word gonna fight." After the shooting, Defendant ran back to his car, and he and Jared fled the scene.

Later on the date of the shooting, Defendant invited another nephew, Richard Zesk (Richard), to accompany him to Big Bear. While in Big Bear, Defendant told Richard that he and Jared had gone to a party in Moreno Valley in Defendant's car. Defendant related to Richard that he and Jared were told to leave the party when someone got mad over spilled alcohol or something. Once outside, Defendant and Jared got "jumped" and someone hit them, with Jared being the person jumped on the most. Defendant and Jared left the party, but returned a little while later, in Defendant's car, and Defendant brought a gun. Defendant parked down the street, and went to the party while Jared stayed with the car. Defendant found one of the men who had jumped Jared and "lured" the victim outside under the ruse that Jared was outside and that Jared wanted to fight one-on-one. As Defendant and the victim walked outside through the side yard, the victim stopped to talk to someone, and while the victim was talking to someone, Defendant turned around

---

[5] On cross-examination, the witness testified that he assumed it was the shooter who said this.

and shot the victim  Defendant then ran back to his car and drove away with Jared.

Defendant described to Richard the person that he shot as an African-American male.

Timothy Schwenk, a deputy sheriff of Riverside County, responded to a call about the shooting.  When deputy Schwenk arrived, witnesses led the deputy to the backyard where the victim, an African-American male who had a gunshot wound, was sitting in a chair.  The victim, identified by the deputy as Jevon Massai,[6] was struggling to breathe. The victim died before he was transported to the hospital from a gunshot wound to his chest.  The bullet entered the left side of the victim's back and exited at the left side of his chest.  Defendant also shot the victim in the elbow.

Law enforcement officers interviewed some of the people at the party.  Marvin Coti told police that the shooter was about 18 to 20 years old, wearing a blue flannel jacket or shirt and had tattoos on both sides of his neck.  One of the tattoos was either a 401 or 951.  Bryan Valdovinos, who was also at the party, took a short video using his cell phone to demonstrate "where it's talking about there's going to be a fight," which he provided to one of the investigators.  Valdovinos told the investigator that the shooter was wearing a blue flannel with a black hood, and later identified Defendant as the shooter in a photo lineup.

Defendant's house, car, and cell phone were searched.  Inside Defendant's bedroom, police found a blue and black flannel shirt with a black hood. Gunshot residue

---

[6] Although deputy Schwenk initially identified the victim as "Jevon Massai" the prosecutor later clarified the victim's name, referring to the victim as Massai Cole.  The victim's full name was apparently Massai Jevon Cole.  His surname is consistently given as Cole in the accusatory pleading as well as throughout the testimony.

was found on the blue flannel jacket. Police also found eight .380-caliber automatic expended shell casings like the ones found at the scene of the shooting, and a Ruger handgun box in Defendant's bedroom. Police also found the sweatshirt Jared was wearing at the party inside Defendant's house.

Police gathered surveillance videos from nearby residences and received GPS coordinates of Defendant's cell phone locations on the night of the shooting, showing his movements. The GPS coordinates showed that Defendant's cell phone was heading towards the party at 12:05 a.m. on February 1, 2020. Defendant's cell phone was at the house party at 12:17 a.m. the time of the confrontation seen on the video. At 12:18 a.m. Defendant's cell phone moved to where Defendant's vehicle was parked. The cell phone then moved to Defendant's house at 12:37 a.m., located at 835 Clark Street in Riverside, about 30 minutes away from where the house party was located. At 12:47 a.m. Defendant's cell phone was headed towards the freeway. At about 1:27 a.m. the cell phone was close to the house party. Surveillance video showed Defendant's vehicle driving toward the party. At 1:31 a.m. Defendant's cell phone was near the backyard of the party. At 1:33 a.m. Defendant's cell phone was south of the party. At 1:38 a.m. Defendant's cell phone was across the street from the party. At 1:40 a.m. Defendant's cell phone was near the rear yard of the party. At 1:49 a.m. Defendant's cell phone was about two houses south of the party. At 1:50 a.m. Defendant's cell phone was heading back to the party and at 1:51 a.m. was in front of the house party. At 1:52 a.m. Defendant's cell phone was towards the backyard of the party. At 1:58 a.m. Defendant's cell phone was across the street from the party. At 2:03 a.m. Defendant's cell phone was

7

near the rear of the party. At 2:06 a.m. Defendant's cell phone was now to the west of the house party, and at 2:07 a.m. Defendant's cell phone left the neighborhood and was back at Defendant's home at 2:25 a.m. The video compilation taken from the neighborhood corresponded with the GPS coordinates of Defendant's cell phone and were played for the jury.

Defendant was arrested on February 1, 2020. Defendant had tattoos on his neck. One of the tattoos on the right side of his neck was the number 951, the area code for the city of Moreno Valley. On the following day Jared was arrested and had superficial abrasions on his face and arms.

Defendant was charged by way of indictment with murder (§ 187, subd. (a)), with an enhancement alleged for personal discharge of a firearm, causing great bodily injury/ or death, as well as a special circumstance allegation that Defendant intentionally killed the victim by means of lying-in-wait. (§ 190.2, subd. (a)(15).) After a separate grand jury proceeding, it was also alleged the victim was intentionally killed because of his race, color, religion, nationality, or country of origin, referred to as a hate crime special circumstance. (§190.2, subd. (a)(16).)

Following trial, Defendant was convicted of murder and true findings were made as to the firearm discharge allegation and the lying-in-wait special circumstance. The jury was unable to reach a finding as to the hate crime special circumstance, so the court declared a mistrial as to that allegation. On the date of sentencing, Defendant's motion for a new trial was denied. Defendant was sentenced to life without the possibility of parole for the murder, with a consecutive term of 25 years to life for the firearm discharge

8

enhancement. The People's oral motion to dismiss the hate crime enhancement was granted.

Defendant timely appealed.

**DISCUSSION**

1. ***Whether the Trial Court Erred in Admitting the Video Found on Defendant's YouTube Channel***

Defendant argues the court erred in admitting the evidence of the YouTube video (referred to during trial as the "eye video") because it was a form of artistic expression within the meaning of Evidence Code section 352.2. We disagree.

a. *Background*

Police searched the internet using Defendant's name and discovered a YouTube channel with a username of "DZeskkk." A video was found on his channel, and it was played for the jury. The video was mostly audio, and the lyrics included numerous racial epithets: "Fuckin' space force. [¶] Niggers." "They called me Home Flex after I graduated space force." "White power. [¶] Fuck niggers." "(laughing) Kill them all. [¶] (unintelligible) nigger."

Additionally, a search warrant was executed to search Defendant's cell phone, which produced additional evidence of Defendant's hatred of African-Americans.[7] The People's offer of proof was that Defendant frequently used the "N word" and made

---

[7] The Defendant filed a section 1538.5 motion to suppress certain material obtained from his cell phone because the scope of the search warrant was limited to matters between January 1, and February 3, 2020. The People indicated they had no intention of introducing any evidence.

9

references to Hitler and white power, showing a racial motive to kill. The People acknowledged that the search had exceeded the temporal scope of the search warrant respecting the cell phone information, but that they did not intend to introduce any evidence from Defendant's cell phone in their case-in-chief, although if Defendant testified, the People would introduce the evidence as impeachment.

The court ruled that because the People had alleged a hate crime special circumstance allegation (§ 190.2, subd. (a)(16)), it would allow some of the information to be admitted, specifically the YouTube video referred to as the "eye video" (because of an eye in the background), although it agreed to exclude references to Hitler.

Later, Defendant argued the eye video was inadmissible due to lack of adequate foundation linking the YouTube video to him specifically, and requested an Evidence Code section 402 hearing. The People argued (by way of an offer of proof) that prior to the grand jury proceedings, a Google search of Defendant's name brought up a link to the eye video on YouTube. The eye video was the only video on a YouTube channel under Defendant's name, "DZeskkk."

Defendant objected because the eye depicted in the YouTube video is not his eye, and there was no direct evidence that he posted the eye video on his YouTube channel. The court ruled that it was a matter of weight versus admissibility and found there was sufficient evidence to place the evidence before the jury.

b. *Legal Principles*

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or

10

disprove any disputed fact that is of consequence to the determination of the action."

(Evid. Code, § 210.)  All relevant evidence is admissible.  (Evid. Code, § 351.)

Prior to the enactment of Evidence Code section 352.2, evidence such as rap lyrics "were generally deemed admissible so long as they were relevant and not so unduly prejudicial or confusing as to require exclusion under Evidence Code section 352." (*People v. Venable* (2023) 88 Cal.App.5th 445, 455 (*Venable*), review granted May 17, 2023, S279081, citing *People v. Zepeda* (2008) 167 Cal.App.4th 25, 34–35.)  "The new [Evidence Code] section 352.2 now requires a trial judge to consider in addition that the probative value of such evidence is minimal absent certain markers of truth and that undue prejudice includes the possibility the evidence will inject racial bias and be used to improperly indicate the defendant's propensity for violence.  (Evid. Code, § 352.2, subd. (a))."  (*Venable*, *supra*, at p. 455, review granted.)

Specifically, Evidence Code section 352.2, which took effect on January 1, 2023 (Stats. 2022, ch. 973, § 2) (Assem. Bill No. 2799 (2021-2022 Reg. Sess.)), was enacted to "require a court to consider that undue prejudice includes the possibility that the trier of fact will treat the creative expression as evidence of the defendant's propensity for violence or criminal disposition, as well as the possibility that the evidence will inject racial bias into the proceedings."  (Legis. Counsel's Dig., Assem. Bill No. 2799 (2021-2022 Reg. Sess.), Stats. 2022, ch. 973.)

Evidence Code section 352.2 requires the court to consider, in addition to the factors listed in section 352, that:  "(1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in

11

time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (Evid. Code, § 352.2, subd. (a).)

Evidence Code section 352.2 goes on to provide in subdivision (b), "[i]f proffered and relevant to the issues in the case, the court shall consider the following as well as any additional relevant evidence offered by either party: [¶] (1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression. [¶] (2) Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings. [¶] (3) Evidence to rebut such research or testimony.

Evidence Code section 352.2, subdivision (c) provides, "[f]or purposes of this section, 'creative expression' means the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media."

Much of the recent decisional authority addressing Evidence Code section 352.2 involves the question of retroactivity. (See *Venable*, *supra*, 88 Cal.App.5th at p. 456,

12

review granted [Evid. Code, § 352.2 "is ameliorative and therefore applies to cases that are not yet final"]; see also, *People v. Ramos* (2023) 90 Cal.App.5th 578, 596, review granted July 12, 2023, S280073 [Evid. Code, § 352.2 is "not an ameliorative enactment" and therefore "does not apply retroactively"], and *People v. Slaton* (2023) 95 Cal.App.5th 363, 376, review granted Nov. 15, 2023, S282047 [same].) Retroactivity is not at issue in the present case, where Defendant's trial took place after the effective date of the new legislation.

We review evidentiary rulings for abuse of discretion. (*People v. Boyce* (2014) 59 Cal.4th 672, 687, citing *People v. Streeter* (2012) 54 Cal.4th 205, 237.)

A court abuses its discretion if it acts "in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806.) In other words, the trial court's decision to admit or exclude evidence "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

c. *Analysis*

Defendant's primary objection to the admission of the YouTube video is that it injected racial bias into the proceedings. Defendant does not argue that the trial court abused its discretion by admitting the evidence or that the probative value of the YouTube video as evidence of Defendant's motive was outweighed by the prejudicial effect of the evidence (Evid. Code, § 352), or that the trial court failed to consider the statutory factors

13

set forth in Evidence Code section 352.2.  For the most part, Defendant argues that there is no direct evidence that Defendant was the person who created the uploaded post.

Defendant also does not argue that admission of the video into evidence constituted a specific violation of Evidence Code section 352.2, or demonstrate the prejudicial effect of the admission of evidence, so any such argument is forfeited. "'[E]ach appellant has the burden of demonstrating error and prejudice.'"  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364, citing *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)  He has failed to cite any authority for the proposition that such evidence is irrelevant in a case where a hate-crime special circumstance is alleged.

It is generally held that, "[t]o demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error."  (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)  An appellant who fails to do so does not meet his burden on appeal, and a reviewing court need not consider the claim.  (*People v. Catlin* (2001) 26 Cal.4th 81, 133 [The defendant "fails to offer any authority or argument in support of this claim, so it is not considered"].)

More importantly, because the jury failed to reach a decision on the hate crime special circumstance, Defendant cannot show, and has not shown any prejudice, demonstrated by the absence of any attempt to establish prejudice in his brief. Nevertheless, due to the seriousness of the charges, we briefly address the merits.

We disagree that the evidence of the YouTube video injected race into the proceedings, because that issue was injected by the special circumstance allegation that the crime was committed due to the victim's race.  Having alleged the special

14

circumstance that the victim was intentionally killed because of his, color, religion, nationality, or country of origin, the People had the burden of proving that the Defendant was motivated to kill the victim due to the victim's race, color, religion, nationality or country of origin.  (1 CALCRIM No. 700 ["The People have the burden of proving (the/each) special circumstance beyond a reasonable doubt"].)

Because the hate-crime special circumstance relates to a racial motive for the murder, evidence tending to show Defendant's racial prejudice or hatred was relevant, and, as relevant evidence, admissible.  In this respect, the special circumstance provides an "enhanced penalty for first degree murder committed because of prohibited bias motivation and is not directed at free expression protected by the First Amendment." (*People v. Lindberg* (2008) 45 Cal.4th 1, 37, citing *Wisconsin v. Mitchell* (1993) 508 U.S. 476, 485–490 [holding that the enhancement statute, directed at conduct committed because of prohibited bias motivation, does not punish free speech in violation of the First Amendment]; *In re M.S.* (1995) 10 Cal.4th 698, 725 [holding that § 422.7, a hate crime statute, properly sanctions bias-motivated conduct and does not implicate a defendant's First Amendment rights].)

The offensive tract in question is highly probative of Defendant's bias and prejudice against African-Americans, or the "hate" aspect of the murder.  Evidence Code section 1101, subdivision (b), expressly authorizes the introduction of evidence of a crime, civil wrong, *or other act* when relevant to prove some fact, such as motive. Demonstrating through expressions attributable to Defendant that he hates African-Americans was highly relevant to his motive to kill the victim, where Defendant appears

15

to have sought out the victim by making multiple entrances to the house party and backyard to find the victim to lure away. Given that there were others involved in the assault on Jared who were not African-American, there is a strong inference Defendant intentionally sought out the only African-American due to the victim's race.

The court advised defense counsel that the defense could challenge the weight of the evidence, and the defense called two African-American witnesses who had been Defendant's friends in high school. Defendant was also afforded an opportunity to challenge the foundation for admissibility of the video but presented no evidence. It was Defendant's burden to challenge the foundation for the admission of the YouTube video by showing it was not linked to him, but he did not do so.

The video posted on YouTube was relevant to establish the racial prejudice of the person posting it, identified as "DZeskkk." A nexus to Defendant was logical in the absence of evidence that the video was created by someone else, or that the YouTube channel was not linked to Defendant, where the video was located by executing a Google search for Defendant's name. The content revealed a decidedly racially prejudiced sentiment against African-Americans; it was bigoted and hateful.

The reference to "kill them all" was also relevant to motive, the thrust of the hate-crime special circumstance. Relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People v. Lamb* (2024) 16 Cal.5th 400, 423.) As such, evidence of the video posted on Defendant's YouTube channel, evidencing racial bias, prejudice, and hatred, had probative value. Considered along with statements made by or

16

attributed to Defendant while at the party using racial slurs, and his use of similar epithets and expressions of anti-African-American sentiment, the YouTube video clip was relevant as evidence of a racially biased motive for the shooting.

The court's in limine rulings indicated that a proper foundation for admissibility had been laid, which Defendant does not challenge here. The court allowed Defendant to attack the weight of the evidence, which he did, by introducing evidence he had African-American high school friends. Defendant was also free to introduce evidence that someone other than himself created and posted the video on YouTube during his in limine challenge to the foundation of the evidence, but Defendant did not do so.

Further, the trial court specifically referred to Evidence Code section 352.2, so we presume the court followed its mandate and exercised its discretion after considering the statutory provisions. (See Evid. Code, § 664 [presumption that official duty has been regularly presumed]; *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527 [presumption that court exercised discretion at sentencing].)

Defendant's greatest obstacle to his challenge is his failure to argue or demonstrate prejudice from the admission of the evidence, in light of the fact the jury failed to make a true finding on the hate-crime special circumstances. Absent error or prejudice, Defendant has failed to carry his burden on appeal.

2. ***Whether the Trial Court Properly Refused to Instruct the Jury on Voluntary Manslaughter Based on Imperfect Self-Defense***

Defendant argues that the trial court improperly refused to instruct the jury on principles of imperfect self-defense, thereby negating the lesser offense of voluntary

17

manslaughter.  Defendant's argument in the trial court was that Defendant was surrounded by the victim's friends and that Defendant was fearful because Jared had been assaulted earlier.  We disagree.

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

Thus, when there is "substantial evidence of imperfect self-defense in a murder case, the trial court's failure to instruct on that theory precludes the jury from making a factual finding that is necessary to prove the malice element of murder." (*People v. Schuller* (2023) 15 Cal.5th 237, 260.)  In such situations, the error "amounts to a violation of the federal Constitution and is subject to *Chapman's* 'beyond a reasonable doubt' standard for evaluating prejudice.  (*Ibid.*, referring to *Chapman v. California* (1967) 386 U.S. 18, 24.)

"An instruction on a lesser included offense is required when the evidence that the defendant is guilty only of the lesser offense is "'substantial enough to merit consideration' by the jury."  [Citations.]  Substantial evidence consists of evidence from which a reasonable jury could conclude the lesser offense, but not the greater, was committed.'  [Citation.]  A reviewing court should not evaluate the credibility of witnesses.  [Citation.]  '[T]he existence of "*any* evidence, no matter how weak" will not

18

justify instructions on a lesser included offense.'" (*People v. Martinez* (2024) 106 Cal.App.5th 892, 901.)

It is not error to refuse an instruction on voluntary manslaughter unless those lesser included offenses supported by substantial evidence. (*People v. Duff* (2014) 58 Cal.4th 527, 562.) "'Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.'" (*People v. Thomas* (2023) 14 Cal.5th 327, 385 (*Thomas*), citing *People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).)

Imperfect self-defense "occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death." (*Simon*, *supra*, 1 Cal.5th at p. 132.) "Imperfect self-defense reduces an intentional, unlawful killing to voluntary manslaughter, a lesser included offense of murder, by negating a defendant's malice." (*Thomas*, *supra*, 14 Cal.5th at p. 386, citing *Simon*, at p. 132.)

It is insufficient that one is provoked and later kills. (*People v. Beltran* (2013) 56 Cal.4th 935, 951.) Additionally, it is error to instruct on a lesser included offense when a defendant, if guilty at all, could only be guilty of the greater offense, i.e., when the evidence, even construed most favorably to the defendant, would not support a finding of guilt of the lesser included offense but would support a finding of guilt of the offense charged. (*People v. Hawkins* (1995) 10 Cal. 4th 920, 954, overruled on a different point in *People v. Blakely* (2000) 23 Cal.4th 82, 89 & *People v. Lasko* (2000) 23 Cal.4th 101, 110; *People v. Stewart* (2000) 77 Cal.App.4th 785, 795–796.)

Here, Defendant did not testify at trial, so there was no evidence presented to the jury that he honestly and reasonably believed he had killed in the unreasonable belief that his life or Jared's was in imminent danger. (See *People v. Brooks* (2017) 3 Cal.5th 1, 75.) Further, there was a cooling off period when Defendant and Jared drove back to their home to change clothes and obtain the firearm that was used in the shooting of the victim. A finding that Defendant harbored an unreasonable fear of imminent harm after such a delay would have been a longshot.

We conclude there was no instructional error in failing to instruct on either imperfect self-defense or instructing on the lesser offense of manslaughter. The evidence that Defendant (along with Jared) left the party stating that he would shoot up the party, went home, changed clothes, obtained a firearm, returned to the party, sought out the victim, lured the victim to accompany Defendant to the front of the house, and shot the victim while the victim's back was turned to speak to another party guest, is susceptible to only one interpretation: Defendant premeditated the murder of the victim and intentionally killed the victim by means of lying-in-wait.

Absent any evidence presented to support an instruction on imperfect self-defense or voluntary manslaughter as a lesser offense, there is no error in refusing to give the requested instructions.

3. ***Whether the Trial Court Abused Its Discretion in Denying Defendant's Motion for a New Trial Based on the Definition of Intent to Kill Following a Jury Question***

Defendant argues that the trial court abused its discretion in denying his motion for a new trial, brought on the ground the trial court gave an improper definition of intent to

20

kill in response to a jury question, regarding the special circumstances finding. We disagree.

Both in the trial court and in this court, Defendant has placed his reliance on decisional authority (*People v.* [*Jose Francisco*] *Guerra* (2006) 37 Cal.4th 1067 ([*J.F.*] *Guerra*),[8] which purportedly discusses the element of specific intent to kill necessary to support an attempted murder charge. However, in that [*J.F.*] *Guerra* case, the defendant was charged with felony murder, along with a special circumstance allegation that the murder was committed in the course of an attempted rape, not attempted murder. (*Id.*, at pp. 1129–1133.) The only reference to attempted murder in that case related to the trial court's proposed instructions related to unadjudicated prior criminal activity evidence, offered at trial in that case pursuant to former section 190.3, subfactor (b). (*Id.*, at p. 1146.) This [*J.F.*] *Guerra* case is inapposite.

Additionally, the passage quoted by Defendant in his opening brief does not relate to the definition of intent to kill to support a special circumstance finding. Instead, Defendant refers incorrectly to the passage addressing the specific intent to kill needed to support an attempted murder charge in a different *Guerra* case, *People v.* [*Danny Montana*] *Guerra* (1985) 40 Cal.3d 377 ([*D.M.*] *Guerra*). In that [*D.M.*] *Guerra* decision, the defendant was convicted of murder as well as attempted murder, along with

---

[8] Defendant has cited two different cases involving defendants with the same surname. The defendants in the two decisions are not the same person, and the issues are not the same. The citation referred to in Defendant's brief refers to an earlier opinion which we ultimately found in our research, as we point out. To distinguish the two opinions, we insert the first names or initials of the respective defendants in brackets.

21

robbery and multiple special circumstances allegations. (*Id.*, at p. 381.) The passage cited by Defendant in his opening brief refers to the challenge to the attempted murder conviction, not the murder count, and not the special circumstance allegation, so it is inapplicable to a review of the adequacy of the definition of intent to kill required for a special circumstance allegation.

In the [*D.M.*] *Guerra*, *supra*, 40 Cal.3d at page 387 case that we found in our research, the court instructed the jury on two theories of murder: willful, deliberate and premeditated murder, as well as felony murder. However, in instructing the jury on the felony-murder special circumstance, the court did not instruct the jury of the need to find an intent to kill, as required by the then recently decided case, *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 152–154.) Because the Supreme Court could not determine which theory was adopted by the jury in finding the defendant guilty of first degree murder, it declined to imply a finding of intent to kill for the special circumstance allegation from the fact of the defendant's first degree murder conviction. ([*D.M.*] *Guerra*, at p. 388.)

This authority is also unhelpful to our decision. Defendant was not charged with attempted murder, and the trial court did instruct the jury on intent to kill for the special circumstance allegation. Defendant has cited no authority holding that the instruction used by the trial court in instructing the jury on this element was incorrect and we conclude there was no error in the instruction on intent to kill given to the jury in response to its question for further definition of the element respecting the special circumstance.

The trial court did not abuse its discretion in denying Defendant's motion for new trial for instructional error.

4. ***Whether the Trial Court Properly Admitted for Impeachment Evidence of Defendant's Racial Slurs and References to White Power Found on Defendant's Cell Phone***

Defendant argues that the trial court made an erroneous in limine ruling to permit the People to impeach him with evidence of his messages in which racial epithets are used.

However, we note that Defendant did not testify so no impeachment evidence was ever introduced. This is fatal to Defendant's claim of error in the in limine ruling on the proposed impeachment evidence. An in limine ruling on admissibility is not binding if the evidence is later introduced. (*People v. Williams* (1988) 44 Cal.3d 883, 912.) It is now well-settled jurisprudence that a defendant must testify to preserve a challenge to the court's tentative ruling on impeachment. (*People v. Duong* (2020) 10 Cal.5th 36, 57, citing *People v. Ledesma* (2006) 39 Cal.4th 641, 731.)

However, because the Defendant did not testify, no impeachment evidence was introduced. Because Defendant did not testify, he may not challenge the in limine ruling by the trial court on the admissibility of potentially impeaching evidence.

5. ***Whether the Trial Court Abused Its Discretion in Denying Defendant's New Trial Motion on the Ground the Verdict Was Contrary to Law or Evidence***

Defendant argues the trial court abused its discretion in denying his motion for new trial on the ground the verdict was contrary to law or evidence. In making his

23

argument, Defendant claims his case is factually similar to that of *People v. Oliver* (1975) 46 Ca1.App.3d 747 (*Oliver*), where the reviewing court affirmed an order granting a new trial in the interest of justice. Specifically, Defendant asserts, "The facts of *Oliver* are similar. The defendant presented alibi evidence which, although it did not exclude the possibility that he committed the crime, made it highly unlikely if the evidence was believed. Indeed, one of the victims who identified defendant had been unable to identify defendant's picture the day after the robbery. The court granted a new trial."

Defendant provides no legal analysis to support this analogy. He has set forth cases discussing the general principles governing review of orders granting or denying new trial motions. Defendant's motion for a new trial was made on multiple grounds, with one heading that referred to the verdict being contrary to law or evidence. The argument there was similar to that made on appeal, in that Defendant provided the court with only a discussion of the legal principles governing new trial motions in general, as well as a reference to *Oliver*, *supra*, 46 Ca1.App.3d 747, without any pinpoint reference, and the curious statement that this case was similar. It is not similar in any respect.

However, at no point, either in the trial court or on appeal, has the Defendant indicated a factual or evidentiary analysis of how the verdict in this case was contrary to the law or the evidence, and at the hearing on the motion in the trial court, when the court invited further argument, defense counsel simply submitted on the moving papers. The court therefore reviewed the claim as it related to the lying-in-wait special circumstance, summarized the record evidence supporting the verdicts and findings, and concluded it

was "a classic lying-in-wait." Defendant did not ask the court for further consideration of the sufficiency of the evidence on any other issue or finding.

On appeal, Defendant's only legal analysis to support the propriety of granting a new trial in this case was the same reference to *Oliver*, *supra*, 46 Ca1.App.3d 747, where the order granting (not denying) the new trial did not specify any grounds. On appeal, the reviewing court noted that the trial court had made prejudicial comments on the believability of the defendant, Oliver, and the defense witnesses' testimony, infecting the verdict. (*Id.*, at p. 753.) This case does not support Defendant's position that a new trial should have been granted on the ground that the verdict was contrary to the law or evidence in this case.

As the Supreme Court summarized in *People v. Davis* (1995) 10 Cal.4th 463 at pages 523–524, "In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' [Citation.] [¶] A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. '"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."'"

Here, the trial court went through the evidence as viewed in light of the elements of the special circumstance allegation and found it was clear Defendant's intent was to kill the victim and catch the victim by surprise, after going in and out of the house where the party took place, waiting for an opportunity to lure the victim away from the party and shoot the victim. The trial court did not abuse its discretion in denying the motion for a new trial on the ground the verdict was contrary to law or evidence.

6. ***Whether Substantial Evidence Supports the True Finding on the Lying-in-Wait Special Circumstances Allegation***

Defendant argues that the special circumstances finding of lying-in-wait was not supported by substantial evidence. We disagree.

On a challenge to the sufficiency of trial evidence to support a jury's factual determinations, we review the whole record to determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' [Citations.] 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

The requirements for the lying-in-wait special circumstance are slightly different from, and more stringent than, the requirements for lying-in-wait first degree murder. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1072–1073.) Lying-in-wait first degree

26

murder requires only that the murder be perpetrated "by means of" lying in wait (§ 189, subd. (a)), while the lying-in-wait special circumstance applies to murders where the defendant "intentionally killed the victim by means of lying in wait." (§ 190.2, subd. (a)(15); *People v. Lewis* (2008) 43 Cal.4th 415, 511–512.)

Although the language of section 190.2, subdivision (a)(15), as it existed up until 2006, required a finding that the murder was committed "*while* lying in wait" the current version of the lying-in-wait special circumstance employs the language "'by means of' lying in wait," and requires proof of "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Nelson* (2016) 1 Cal.5th 513, 549, citing *People v. Morales* (1989) 48 Cal.3d 527, 557.) It is not sufficient to merely show the elements of waiting, watching and concealment; it must also be shown that the defendant did those physical acts with the intent to take his victim unawares and for the purpose of facilitating his attack. (*People v. Brown* (2023) 14 Cal.5th 453, 465, citing *People v. Mattison* (1971) 4 Cal.3d 177, 183.)

"'The element of concealment is satisfied by a showing "'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.'"'" (*Nelson*, *supra*, 1 Cal.5th at pp. 549–550, citing *People v. Sims* (1993) 5 Cal.4th 405, 432–433 & *People v. Combs* (2004) 34 Cal.4th 821, 853.) Further, "physical concealment from, or an actual ambush

of, the victim is not a necessary element of the offense of lying-in-wait murder." (*People v. Arellano* (2004) 125 Cal.App.4th 1088, 1095 (*Arellano*).)

"'The concealment which is required, is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.] It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct.'" (A*rellano*, *supra*, 125 Cal.App.4th at p. 1096, citing *People v. Morales* (1989) 48 Cal.3d 527, 554–555, overruled on a different point in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

There is substantial evidence in the present case where the requisite elements of the lying-in-wait special circumstance have been met: Defendant left the party after stating an intent to return to shoot up the party and he did return to the party with a firearm. Defendant went into the party and back outside again several times before going to the backyard. When Defendant located the victim, Defendant told the victim that Jared was outside and that if the victim came outside, Jared and the victim could fight one-on-one. In so doing, Defendant concealed his true purpose in luring the victim away from the party. Defendant and the victim then walked around the side of the house, where the victim turned to speak to someone. Defendant, who held the gun at his hip level, turned and fired at the victim as the victim's back was turned to speak to the other individual, from a position of advantage in a surprise move. Defendant then fled and drove home with Jared.

This evidence shows that Defendant lured the victim to accompany him to the front of the house, concealing the weapon and Defendant's true intent to shoot "the victim unawares." (*People v. Brown*, *supra*, 14 Cal.5th at p. 465.) Defendant's actions satisfy the requirements for a lying-in-wait special circumstance.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.


We concur:

FIELDS _____
J.

RAPHAEL _____
J.